**GRAHAM v. CHILDERS, State Auditor, et al.**

No. 16573—Opinion Filed Nov. 3, 1925.

Rehearing Denied Jan. 26, 1926.

(Syllabus.)

1. States—Statutes — Validity of Appropriation Act Within Constitutional Limit of Tax Levy.

To be invalid, when otherwise within its authority, an appropriation, regularly made by the Legislature and approved by the Governor, must appear to require a tax levy in excess of 3½ mills for the fiscal year for which made, in violation of section 9, art. 10, of the Constitution. When an appropriation is made during a current fiscal year to supplement a former one to be used during such year, after the State Equalization Board has fixed the mill levy to raise the estimated expenses for such year, it is valid for the purpose intended in the absence of proof that the previously authorized legal expenditures would consume more money than could be raised for such fiscal year by a levy of 3½ mills, on an ad valorem basis, other revenues considered.

2. Same — Supplemental Appropriation for Schools Not "Debt."

An appropriation supplementing a prior one to carry out a policy of the state as to its public schools, which is to be paid from current revenues, is in no wise a debt within the meaning of section 23, art. 10, of the Constitution.

Error from District Court, Oklahoma County; Wm. H. Zwick, Judge.

Injunction by W. A. Graham against Charles C. Childers, State Auditor, and another. Judgment for defendants, and plaintiff appeals. Affirmed.

Langley & Langley, for plaintiff in error.

Lydick, McPherren & Wilson, George F. Short, Atty. Gen., and J. Berry King and V. P. Crowe, Asst. Attys. Gen., for defendants in error.

BRANSON, V. C. J. W. A. Graham sought an injunction against C. C. Childers as State Auditor, and A. S. J. Shaw, State Treasurer of the state of Oklahoma. The judgment of the district court of Oklahoma county sustained a demurrer to the evidence offered by the plaintiff and dismissed his petition. To reverse this judgment, the plaintiff prosecutes error.

The injunction was sought to restrain the State Auditor from issuing a warrant to pay for school books, as contemplated by Senate Bill 87, which is chapter 16, Session Laws of Oklahoma, 1925. (Reference is made to said act for its provisions.) This act was approved April 19, 1925. It appropriated, out of the moneys in the state treasury not otherwise appropriated, the sum of $650,000, or so much thereof as might be needed to supplement the appropriation made by section 1 of chapter 175, Session Laws of Oklahoma, 1923. Said last-named act was entitled, "An Act providing for a system of state text-books in the public schools of Oklahoma, appropriating and setting aside the net proceeds of money collected from all foreign insurance companies doing business in the state of Oklahoma (foreign fire insurance companies excepted) and establishing a fund to be known as the state text-book fund; directing the State Insurance Commissioner to deposit said money with the State Treasurer, who shall designate said deposit as the state text-book fund; providing a method of distributing and otherwise putting into use said text-books in all the public schools of the state beginning August 1, 1924; amending and repealing certain existing text-book laws, making an appropriation to carry out the purposes of the act and declaring an emergency." (Reference is made to said chapter 175, Session Laws 1923, for the provisions thereof.) To epitomize the said state text-book bill, it required the adoption, by the designated board, of text-books to be used in the public schools of the state up to and including the eighth grade. It requires the publishers, to whom contracts for such books as were adopted were divided, to establish, at Oklahoma City, a depository, from which all immediate demands could be supplied. Books were to be obtained therefrom by requisitions made by the State Superintendent of Public Instruction. The contracting publishers, under penalty, were to furnish the books needed and they were to be supplied to each school district of the state through the respective county superintendents of schools in each county; distribution to be made to the school children throughout the state in each district of all books required to be used in the grades above mentioned, without cost to the children. To begin the work contemplated by said act, the sum of $600,000 was appropriated for the fiscal year beginning July 1, 1923, and ending June 30, 1924; $350,000 for the fiscal year beginning July 1, 1924, and ending June 30, 1925. The purchase of the books was to be made by the State Superintendent of Public Instruction, the same to be approved by the State Board of Education.

After the said act became effective and the number and cost of the books required to be supplied thereby was ascertained, it developed that to fully comply with said act would require an expenditure of approximately $1,600,000. The State Superintendent of Public Instruction requisitioned from the publishers whose books had been adopted by the board only so many books for which the money appropriated by the said last named act would pay. While it is insisted by the plaintiff, Graham, through a vigorous argument made by his counsel, that the superintendent in reality contracted for and undertook to bind the state to pay for approximately $1,600,000 worth of books in violation of the provisions of the Constitution and law of the state hereinafter referred to, the evidence offered shows that he cautiously stayed within the appropriation and did not in reality undertake to bind the state to pay for the extra books required to fulfill the purposes of said act in supplying free text-books to the school children in each school district of the state; for no law even purported to give him authority to create a debt, and without such, no officer could effect such purpose. The publishers, recognizing the public policy of Oklahoma touching its public school system, as set forth in said chapter 175, supplied, in the nature of a loan, the books of value in excess of the appropriation available to pay for, subject to their being purchased on the convening of the next Legislature. The said first-named appropriation bill of the 1925 Legislature was passed to meet this situation.

Plaintiff contends that said appropriation was without legal force and effect for that there were no funds in the state treasury, or provided at the time, to pay said amount, for the reason that appropriations theretofore made exhausted all the revenue provided for the current year, and that said last-named appropriation violates the "cash or pay as you go" policy alleged to be fixed by the Constitution and laws of the state; the plaintiff contending in his brief: "The expense of government of each year must be taken care of by the revenue of that particular year, and no fiscal year has the right to unload any of its financial burdens upon the succeeding year or years." The constitutional provisions drawn into his contention are:

Section 55, art. 5, which provides: treasury of this state, nor any of its funds,

"No money shall ever be paid out of the nor any of the funds under its management except in pursuance of an appropriation by law. * * *"

Section 2, art. 10:

"The Legislature shall provide by law for an annual tax sufficient, with other resources, to defray the estimated ordinary expenses of the state for each fiscal year."

Section 3, art. 10:

"Whenever the expenses of any fiscal year shall exceed the income, the Legislature may provide for levying a tax for the ensuing fiscal year, which, with other resources, shall be sufficient to pay the deficiency as well as the estimated ordinary expenses of the state for the ensuing year."

Section 23, art. 10:

"The state may to meet casual deficits or failure in revenues, or for expenses not provided for, contract debts; but such debts, direct and contingent, singly or in the aggregate, shall not, at any time, exceed four hundred thousand dollars, and the moneys arising from the loans creating such debts shall be applied for the purposes for which they were obtained or to repay the debts so contracted, and to no other purpose whatever."

In conjunction with these sections plaintiff presents section 9690, C. O. S. 1921, which levies, as directed in said section 2, art. 10, of the Constitution, supra—

"Annually an ad valorem tax upon all property in this state which may be subject to taxation upon such basis, a tax sufficient, in addition to the income from all other sources, to pay the expenses of the state government for each fiscal year ending on the thirtieth day of June and to pay the deficiency, if any, for the year next preceding. * * *"

The latter part of said section seems to have been amply within constitutional authority as contained in section 3, art. 10, which provides:

"Whenever the expenses of any fiscal year shall exceed the income, the Legislature may provide for levying a tax for the ensuing fiscal year, which, with other resources, shall be sufficient to pay the deficiency as well as the estimated ordinary expenses of the state for the ensuing year."

It is the contention of the plaintiff that the fiscal system is the "pay as you go" system and is clearly in intendment to be the same as that of municipal subdivisions of the state to the extent that the needed expenses may be ascertained for maintaining the state government as the law has directed it to be maintained. He cites Campbell v. State, 23 Okla. 109, 99 Pac. 778; O'Neil Engineering Co. v. Ryan, 32 Okla.

738, 124 Pac. 19; State v. Stanfield, 34 Okla. 524, 126 Pac. 239. These cases deal only with municipal subdivisions and have no reference to the sovereign. We do not find fault with the plaintiff for making this contention. An examination of the Constitution and statutes shows there is little if any analogy between the fiscal system of the municipal subdivisions of the state and that of the sovereign itself. This is true for what might be termed an axiomatic principle of the law, to wit: That the municipal subdivisions can, in the exercise of their contractual power, do only those things, which incur an expenditure of public funds, which are expressly authorized by the Constitution and statutes of the state, whereas, the rule governing the sovereign is entirely to the contrary. The sovereign speaks through its legislative body, and the legislative body determines the policy of the sovereign, which has no limitation as to expenditures, save and except those which are expressly placed on its exercise by the Constitution of the state. So we find that municipal subdivisions must have express authority, while the sovereign, to be limited, must have express limitations. We find this clear distinction pointed out in no less a document than the Constitution itself. Sections 2, 3, and 9, art. 10, of the Constitution are limitations so far as ordinary expenses are concerned. The first of said sections commands the Legislature to provide by law for an annual tax to defray the estimated **ordinary** expenses for each fiscal year. This constitutional provision is the basis for said section 9690, C. O. S. 1921. Section 3 of the Constitution provides that when the expense of any fiscal year exceeds the income, the Legislature may provide for levying a tax the ensuing fiscal year to pay the same. This last named section is the basis for the concluding part of section 9690, C. O. S. 1921. We find no limitation upon the amount the Legislature may appropriate save and except that found in section 9 to the effect that the said levy shall not be more than 3½ mills; this, of course, on the ad valorem valuations of the state as equalized by the State Board of Equalization, which said equalization board is provided for by section 21, art. 10. Its duties are: (1) To equalize the valuations of the state; (2) to assess public service corporations; and (3) to perform such other duties as may be prescribed by law. One duty prescribed by law is to provide for a sufficient tax to take care of a deficiency of a preceding year. The tender of proof made to the trial court in the instant case, which

was rejected, went only to this extent, that the plaintiff offered proof, by the Assistant State Treasurer, that the levy for the fiscal year 1924-1925 had been made by the Board of Equalization (of course he meant by this that the board had certified the number of mills necessary to raise the estimated ordinary expenses as referred to in said section 2 of art. 10, for the Legislature makes the levy, and not the the board) before the instant appropriation was made; that the $650,000 was not within the estimated needs made by the board, and that there was a deficit in the treasury anticipating all uncollected revenues which would accrue for the fiscal year ending June 30, 1925, on the mills levy fixed by the board. How any man could know and testify to this state of facts offered, no attempt is made to show.

By the sections of the Constitution above set out, and others, it is clear that the Legislature is the tax-levying authority for state purposes. The limitation directed against this authority is found in sec. 9, art. 10, supra, i. e., the 3½ mill limitation on an ad valorem basis, and we would, with great reluctance, leave any impression that the Legislature could evade this maximum amount for any given fiscal year by any indirect method or by attempting to do so under section 3, art. 10, supra, as vitalized by section 9690. But there is no tender of proof in the instant case that at the time of the enactment of the bill, drawn in question, the appropriations already made would exceed a 3½ mill ad valorem levy and the income of the state from other sources. This appropriation bill was in the nature of a remedial legislation or a curative statute. By chapter 175, Laws of the regular biennial session, 1923. a policy or purpose had been declared, and direction given to the proper officers to carry the same into effect, and that policy was to furnish free text-books to the public school children within certain grades in the state of Oklahoma. The mere fact that the Legislature, perhaps from lack of proper statistical information. failed to make an appropriation sufficient to carry out this purpose, would in no wise preclude it from doing so, if it can be done within the constitutional limitations at a subsequent session held during the biennial term. The money appropriated was intended to be spent in supplementing or adding to the former appropriation what the facts demonstrated was necessary to properly carry out the purpose of the original act. No one would gainsay that the amount of the appropriation now drawn in question would

have been within the power of the Legislature to have incorporated in the first-named bill (ch. 175, S. L. 1923). If, at a later date, the Legislature obtained information that the amount designated in said first bill was insufficient, it could cure the defect. He who contends that an act of the sovereign legislative body is in excess of its constitutional authority must sustain the burden of showing a state of facts—if facts are drawn in issue—which, when the applicable provisions of the Constitution are considered, show the attempted exercise of power to be beyond constitutional limitations. Until that is done, the courts indulge every presumption that the legislative conclusion, which was reached by its passage of the act, that the provisions of the act are in fact within its authority was correct. The tender of proof as made was immaterial to any issue raised. The Legislature is convened by the Constitution biennially in January. While so convened, it makes appropriations for two fiscal years; the first beginning July 1st, following the constitutional convening date. The whole taxes for the first of such fiscal years do not, under the law, become due—the details of the statute being complied with by the taxpayer—until June following, and, no doubt, the bulk of such revenue does not actually reach the state treasury until months or years later. In exercising its legislative duty in calculating the necessary mill levies to meet the estimated expenses, the Equalization Board can, at no time, determine accurately the amount of mills necessary, for the perfectly apparent reason that there can be no known method to ascertain how much revenue will come into the state treasury during any given fiscal year from sources other than ad valorem taxation. Therefore, the balance sheet, when finally closed for a given fiscal year, may show a surplus in a large amount, while for another fiscal year it may show a deficit. Conditions beyond the foresight of anyone may bring about this situation; hence, foreseeing this last contingency, said section 3 of art. 10 was made the safety valve. That is to say, when within the constitutional limitations appropriations have been made, the Equalization Board may take into consideration such deficit in calculating the mill levies for a succeeding year, but by this no inference must be drawn that if the maximum provided by section 9 of article 10, supra, has been fixed for a given fiscal year by the board, an appropriation made which should require a levy in excess of that, that this could be done either for the fiscal year for

which the appropriation was intended, or make the levy for a subsequent year beyond the 3½ mills. There is nothing in the instant case to even indicate that the appropriation in question herein goes to either extent.

The act of the Legislature appropriating money sets aside the amount specified for the purpose designated, out of the money in the treasury not otherwise appropriated, either there at the time or that may lawfully be brought there. Moreover, such appropriation is legislative direction to the auditor to draw his warrant for the purpose designated, and is a further direction in effect to the State Board of Equalization that sufficient mills be levied to raise same, and to that extent specifically supplements the general statute, supra, which vitalizes said section 2, art. 10.

Plaintiff again says the act of the State Superintendent was in fact an attempted purchase of books in excess of the appropriation, and the method called a loan was a subterfuge. Suppose this be conceded. We are not to condemn or condone, except in so far as the law drives us. It was certainly the intent of the original bill that the necessary books be supplied. They were supplied, and even should it be conceded in doing so the zeal of the officers led them beyond the pale of the then legal appropriation, there was no binding obligation on the sovereign Legislature to follow such officers, and make it good. But if, on the other hand, the Legislature saw fit to do so, and authorized the payment and its act did not step beyond the constitutional limits, the courts cannot strike down its deliberate enactment. Federation v. Salt Lake County (Utah) 61 Pac. 222; New Orleans v. Clark, 24 L. Ed. (U. S.) 521; Guilford v. Cornell, 18 Barb. (N. Y.) 615; Lycoming v. Union, 15 Pa. St. 166; People v. Burr, 13 Cal. 343; Black, Const. Law. 135; Cooley, Const. Law, 466. See, also, Cayuga Conty v. State, 183 N. Y. Supp. 646; Oswego & Syracuse R. R. Co. v. State, 226 N. Y. 351; Ulster v. State (N. Y.) 69 N. E. 370.

But plaintiff further contends that said act violates said section 23, art. 10. If it does, it cannot be justified or sustained, whatever be our personal inclinations. Said section 23 is quoted above. This section was found in the Constitutions of many states and had been considered by the courts of such states long before it became a part of the Constitution of Oklahoma.

The words "state debt" are shown by

section 4, art. 10, of the Constitution, to have a fixed meaning, or to convey a definite idea of a condition; that is, it is such an obligation as the Legislature is required to provide for by levying a tax to pay the annual interest and sinking fund to liquidate the principal at maturity. Section 23 of art. 10 authorizes such a state debt to meet casual deficits, or failure in revenue, etc., limiting the same at any one time to $400,-000; and further provides the moneys secured by such loans shall be used for the purposes intended.

In the instant case, the Legislature did not attempt to create such a debt, and section 23 has no application to the situation here presented.

The Legislature determined the specific amount to be paid out and named the specific purpose for which it was to be paid; the moneys to come from the public moneys of the state. In so far as any showing is made in the record, in doing so it was amply within its authority, whether the revenue for that particular year was, with all other appropriations, sufficient to meet it, or some part of it must be supplied by an extra amount raised in the ensuing year.

Lastly, as to plaintiff's contention as to the title of the act. All the provisions relate to the manner of expenditure of the appropriation made in the act, and are germane to the subject of the expenditure. Leatherrock v. Lawter, 45 Okla. 715, 147 Pac. 324; Pond Creek v. Haskell, 21 Okla. 711, 97 Pac. 338, 357.

The trial court is affirmed.

NICHOLSON, C. J., and HARRISON, MASON, LESTER, CLARK, and RILEY, JJ., concur.

PHELPS and HUNT, dissent.

Note.—See under (1) 36 Cyc. p. 889. (2) 36 Cyc. p. 884.

---

HUNT, J. (dissenting). I am unable to agree with the majority opinion filed herein, and submit the following dissenting opinion, which fully expresses my views of the matter and the conclusion I think should have been reached.

W. A. Graham sought an injunction against Chas. C. Childers, State Auditor, and A. S. J. Shaw, State Treasurer, to prevent the expenditure of $650,000 appropriated by chapter 16, Session Laws 1925, for payment of text-books furnished the state. On demurrer to the evidence, the trial court dismissed plaintiff's petition, and it is to re-

verse this judgment, this proceeding in error is prosecuted. The injunction was sought to enjoin payment for school books acquired by the state, the appropriation act therefor being approved by the Governor on April 9, 1925, without the emergency clause, being Senate Bill 87, chapter 16, Session Laws 1925. The act appropriating the above sum to supplement the appropriation of $950,000 contained in chapter 175, Session Laws 1923, being the free text-book measure. The latter act authorized the State Superintendent of Public Instruction, with the approval of the State Board of Education, to purchase and distribute to the school districts of the state basic text-books for grades one to eight. The State Superintendent purchased books aggregating a cost of approximately $950,000 pursuant to said chapter 175, Session Laws 1923, and at the same time of the purchase and delivery of such books, the book sellers furnished and delivered to the state other text-books in addition to those purchased as aforesaid costing approximately $650,000, no mark or identification being made to distinguish the books purchased and those not purchased.

On April 10, 1925, one day after the Governor approved chapter 16, supra, ten days after the Legislature adjourned and 80 days before the same act became effective and after the same Legislature had repealed chapter 175, Session Laws 1923, thus evincing a policy to no longer furnish free text-books, the State Superintendent signed a written order of purchase addressed to the booksellers, purchasing all books furnished by the book companies and not theretofore regularly purchased; all of said books being delivered to the state prior to passage of chapter 16, supra, and prior to order of April 10, 1925.

The record does not disclose whether or not this purchase by the State Superintendent was ever approved by the State Board of Education as required by chapter 175, supra. The plaintiff contends the acquisition by the state of the $650,000 worth of books amounted to a purchase which was not authorized at the time the books were acquired, and therefore ultra vires, and defendants contend that same was only a loan which was later converted into a purchase by the order of the State Superintendent above referred to. It is immaterial whether the books were borrowed or purchased.

The borrowing of property by public officials on behalf of the state, no appropriation existing to pay for the thing borrowed, is the doing of a thing by indirection that can-

not legally be done directly, and if permitted to be done would deprive the Legislature of its prerogative of providing for the expense of government, and would subject the Legislature to embarrassment and confusion and make it necessary for it to refuse to pay for property received and used by the state and would violate a well-settled fiscal policy of the state of "cash or pay as you go" relative to the expense of the state government. It is well settled by the law of this state that public officers entrusted with ministerial and executive duties have only such power as is specially delegated by law in relation to administration of our government. National Surety Co. v. Sand Springs State Bank, 74 Okla. 176, 177 Pac. 574; Farley v. Board of Education. 62 Okla. 181, 162 Pac. 797.

The limitations placed in article 10 of our Constitution prevail upon us to hold that property needed by the state in the operation of government which cannot be purchased legally cannot by indirection be borrowed, until funds are made available by appropriation of the Legislature with which to pay for same.

Plaintiff's second assignment of error is to the effect that the court erred in sustaining objections to certain testimony offered on behalf of plaintiff. In our opinion this case turns on the proposition of whether or not there was in the hands of the State Treasurer on June 30, 1925, at the time the act here in question became effective, sufficient funds "not otherwise appropriated" to pay the amount appropriated. If not, the appropriation was in excess of the income and revenue provided for that year, and according to the terms of the act itself, which specifically limited it to any funds in the hands of the State Treasurer not otherwise appropriated, cannot be upheld. We are therefore of the opinion that the court erred in rejecting evidence offered by plaintiff to the effect that on the day the $650,-000 appropriation act became effective there were no funds in the hands of the State Treasurer or that would get into his hands, considering all uncollected revenues to accrue for the fiscal year ending June 30, 1925, as being in the treasury on that day, "not otherwise appropriated". We are well aware that the state has various sources of revenue other than the tax levy for state purposes, and the revenue from such sources might increase the funds in the hands of the State Treasurer for any one year to an amount far in excess of the amount appropriated for said year, and therefore create a surplus which would constitute funds in the hands of the State Treasurer not appropriated for any purpose, and if so, same would be within the terms of the appropriation act herein complained of. It would seem, therefore, that the testimony offered and rejected was not only competent, but absolutely essential to a proper determination of this case, and the refusal of the trial court to admit same constituted reversible error. While we strongly disapprove of the methods pursued by the officers involved herein in spending all the money appropriated for a certain purpose and then without any authority whatever acquiring property of additional value in an amount almost equal to the original amount appropriated and thus, as is contended, fasten a moral obligation on the state, yet we concede the right of the Legislature, representing the sovereign, to recognize such so-called moral obligation and appropriate sufficient money to discharge same out of any money in the state treasury not otherwise appropriated. We feel, though, that under such circumstances the strictest interpretation should be placed on the constitutional and statutory provisions applicable, and unless same are strictly complied with, such appropriations should not be upheld.

It is not the question, as counsel for defendants contend, that the levy for the fiscal year ending June 30, 1925, was not the maximum levy of 3½ mills as provided by section 9, article 10, of the Constitution, and that the $650,000 appropriation added to other appropriations for that year would not exceed the tax limitation levy of 3½ mills. The question, as we see it, is whether the $650,000 appropriation act is valid, if on the day it became effective there were no moneys in the state treasury not otherwise appropriated, considering as being in the treasury on that day all moneys that would accrue to the treasury for the fiscal year ending June 30, 1925. The income for that fiscal year from ad valorem taxes had already been determined, the levy for state purposes being made long prior to the passage of the act complained of. The Legislature itself did not intend to override the safeguards of the Constitution, for in chapter 16, Session Laws 1925, it used the words "not otherwise appropriated."

Defendants contend that the appropriation of $650,000 is legal and that sections 2 and 3 of article 10 of the Constitution would, in the absence of a levy and other income to the state treasury for state purposes for

the year ending June 30, 1925, apply, and the deficiency could be paid by a levy for the succeeding year. These two sections of article 10 of our Constitution, requiring that any legal deficiency of a previous fiscal year be raised by levy for the succeeding fiscal year, relate only to a legal deficiency after an appropriation by the Legislature at a proper time and for a proper purpose and after due levy has been made and there is a failure in collection of taxes and thus a failure in revenue and the expenses exceed the income and a deficiency is created. In construing section 3, article 10, of the Constitution, in Re application of State to Issue Bonds, 33 Okla. 797, 127 Pac. 1065, this court, speaking through Special Justice Brewer, said: ·

"Section 3, art. 10, subject to no other limitation, provides: 'Whenever the expenses of any fiscal year shall exceed the income, the Legislature may provide for laying tax for the ensuing fiscal year, which, with other resources, shall be sufficient to pay the deficiency, as well as the estimated ordinary expenses for the state for the ensuing year.' This section by its terms shows that it was not intended that, because the expenses of a year might exceed the income for that year, such excess should be invalidated. And we may add that we find no purpose in the Constitution to attach any penalty or forfeiture to obligations for current expenses, honestly incurred in the reasonable anticipation that the revenues provided therefor would be sufficient to meet them. It is believed that these limitations were intended to prevent the contracting of that class of pecuniary obligations not to be satisfied out of the current yearly funds, or other funds in hand lawfully applicable thereto, and which would, therefore, at the date of the contract, be an unprovided for liability and properly included in the general meaning of the word 'debt.'

"There is no contention here that the debts which were incurred, and are evidenced by the warrants sought to be funded, exceeded at the time the debts were incurred the revnue provided in good faith for that year. We therefore have the right to assume that such is not the case, and that, if the revenue provided had been collected and properly applied, they would have been paid".

We agree with counsel that no debt against the state was created in the acquisition of the books here in question, and hence there was no obligation legal or moral to pay for same. Neither does this item come within the term "expenses of any fiscal year," as used in section 3, article 10, supra, or such expenses as Special Justice Brewer refers to in the portion of the opinion above quoted.

We are of the opinion that before section 3, article 10, supra, would apply to the case at bar, there must of necessity have been funds in the state treasury or that would accrue to the treasury from all sources conceding that all taxes would be collected as levied for state purposes, and if in that event still there were uncollected taxes and thus a deficiency caused, section 3, article 10, supra, would apply and the succeeding Legislature should levy a tax to pay the same. Defendants further contend that if the instant $650,000 appropriation, with all other appropriations for fiscal year ending June 30, 1925, did not exceed 3½ mills, as provided by section 9, article 10, of the Constitution, the appropriation act would be valid and the succeeding Legislature, pursuant to section 3, article 10, could make a levy to pay the deficiency. This section of the Constitution (section 9, article 10) limits the state levy to 3½ mills. A lesser amount may be levied, but not more. Where levy has been made for state purposes for a fiscal year, whether it be 3½ mills or less, the Legislature and all officials of the state are prohibited from incurring any liability in any manner for any purpose beyond the revenue provided for that year.

Defendants contend that there was only sufficient money to supply 60 per cent. of the children in grades covered by the act with the books selected, and that it was impossible and impracticable to attempt to furnish only 60 per cent. and exclude 40 per cent. In answer to this, we have only this observation to make, that the act provided only for basic text-books, and did not require the furnishing of all the books selected, and while it, of course, was left to the officers authorized by the act to designate the basic text-books, yet we are of the opinion that it was their plain duty under the terms of the act itself to designate only such text-books as basic as could be supplied to all school children of the state in said grades and still keep within the amount appropriated for that purpose. In other words, it was not within the province of the officers charged with the duty of carrying out the terms of the Act of 1923 to substitute their judgment for that of the Legislature and enlarge and extend the act and increase the obligation of the state either morally or legally far in excess of the amount the state, speaking through its Legislature, had authorized for this purpose. It was clearly the intent of the Legislature to furnish only such basic text-books to the children in the grades designated as could be purchased for $950,000. It is argu-

ed, and we concede, the Legislature of 1923 had the power, subject only to the constitutional limitations, to make the appropriation in this case for $1,600,000 instead of $950,000, and it is further argued that a subsequent Legislature would therefore have the right to make a supplemental appropriation of $650,000, as was done in this case. This we also concede, if there are funds available, not otherwise appropriated; hence our holding that the testimony which was offered and excluded was essential to a proper determination of this case. Such evidence may disclose sufficient of such funds on hand, in which event we would feel impelled to sustain this appropriation. Even then we could not do so without expressing our disapproval of the method pursued in the purchase of the books herein and calling to the attention of public officers generally that the precedent set by the officials involved herein was not to be followed in the future.

It was argued here at length that the state had received these books and was therefore morally bound to pay for same, hence such procedure places an unfair burden on the Legislature and puts it in an attitude either of approving such procedure or repudiating a so-called moral obligation. What right or authority did these officers have to fasten a moral obligation of $650,-000 on the state any more than they did a legal obligation? If they did not have a right to legally bind the state, which even they concede, they do not have any greater right to morally bind the state. It is the province of the Legislature to enact such legislation as in its wisdom it deems to the best interest of the state after a full, free, and fair discussion of same on its merits, unhampered by the acts of officers anticipating such legislation, and for the various state officials to act in accordance therewith in so far as it affects them, and not to act on their own initiative contrary to the express terms of a legislative enactment, and then seek Legislative approval afterwards of official acts that require legislative authority in the first instance. The Legislature, of course, might, as in this case, approve where they might not have in the first instance authorized, with the result that its exclusive functions and prerogatives are invaded.

This case presents a very unusual situation and is without a parallel in the books so far as we have been able to ascertain; at least, none is cited either by plaintiff or defendants. Counsel of defendants in error devote some 23 pages of their very exhaustive brief to the proposition that this is a moral obligation and that "the Constitution does not prohibit the Legislature from appropriating public money in payment of its moral obligations, and it follows that the act herein complained of is constitutional".

With all due deference to eminent counsel, we must confess, in view of the facts as disclosed by the record in this case, this argument does not impress us, for the very simple reason no dire necessity or emergency is shown to exist justifying in the slightest degree the incurring of a moral obligation, but, on the other hand, the record clearly discloses that this situation could easily have been avoided by the officers designated in chapter 175, Session Laws 1923, simply following the plain and unambiguous terms of the act itself and designating only as basic those subjects which could have been purchased and furnished to all the children in the state between grades one to eight for $950,000. It would probably have been necessary to designate only five or six subjects instead of the 12 or 14 selected, but the legislature had spoken on the subject, and it remained only for the officials designated to carry into effect its expressed will as contained in the act.

We are firmly of the opinion that the procedure adopted by the officers involved herein is fundamentally wrong, absolutely contrary to a safe, sane, and sound fiscal policy and against every principle of good government, and that if same were permitted the expenses of state government would run wild. Chief Justice Marshall looked well into the future of government when he laid down the doctrine "that the power to tax is the power to destroy."

Justice Williams of this court, in Campbell v. State ex rel. Brett, 23 Okla. 109, 99 Pac. 778, used this language:

"No one idea stands out more clearly than that barriers should be erected against the creation of municipal indebtedness."

Article 10 of our Constitution is a safeguard to the taxpayers of this state against destruction of this commonwealth by the burden of taxes and public expenditures, and it should be construed as a whole, considering the spirit as well as the strict letter of its provisions.

After a careful and thorough examination of the authorities cited by counsel for defendants, we conclude that none of the authorities cited sustain their contention and hold valid an appropriation such as this when there are no moneys "not otherwise

appropriated" in the state treasury or that would accrue to the treasury from all sources during the fiscal year. We are therefore of the opinion that the case should be reversed and remanded, with directions to grant a new trial, and to proceed in accordance with the views herein expressed.

I am authorized by Mr. Justice PHELPS to state that he concurs with the views herein expressed.