2003 OK 59

In the Matter of the Application of the OKLAHOMA CAPITOL IMPROVE-MENT AUTHORITY for Approval of $155 Million Oklahoma Capitol Improve-ment Authority State Facilities Revenue Bonds, Series 2002C and $20 Million, Series 2002D(Taxable).

No. 97,936.

Supreme Court of Oklahoma.

June 3, 2003.

Rehearing Denied Sept. 8, 2003.

W.A. Drew Edmondson, Attorney General for the State of Oklahoma, Lynn C. Rogers, Assistant Attorney General, Gary M. Bush, Oklahoma City, OK, and Douglas F. Price, Stillwater, OK, for applicant.

Richard James, Stroud, OK, for protestant John Cassidy, Jr.

Protestant Jerry R. Fent, pro se, Oklahoma City, OK.

Protestant Edwin Kessler, pro se, Norman, OK.

BOUDREAU, Justice.

¶1 By amendment to 73 O.S.Supp.1999, § 301,[1] the second regular session of the 47th Oklahoma Legislature in 2000 authorized the Oklahoma Capitol Improvement Authority (OCIA) to issue the proposed State Facilities Revenue Bonds, Series 2002C, in an amount not to exceed $155 million, and Series 2002D (Taxable), in an amount not to exceed $20 million. The proposed $175 million bonds constitute the second half of the $325 million bonds authorized in § 301(C) for the purpose of "providing funding for the projects authorized in subsection A". The proceeds from the

---

1. 2000 Okla.Sess.Laws, ch. 376, § 1.

proposed $175 million bonds are allocated to twenty-seven state agencies by § 301(A)(16). The OCIA initiated this original proceeding seeking approval of the proposed bonds.[2]

¶ 2 Three individuals, protestants John Cassidy, Jr. (Cassidy), Jerry R. Fent (Fent), and Edwin Kessler (Kessler), objected to the bond proposal. Protestants challenged both the authorizing statute, § 301, and the bond-approval process on several state constitutional grounds.

¶ 3 Upon considering the briefs and other filings by the parties and hearing oral argument *en banc*, we conclude that the deciding issue in this controversy is whether the authorizing statute satisfies the purpose-of-borrowing requirement in Okla. Const., art. 10, § 16.[3] We find that § 301 as amended in 2000 does not specify the purposes for which the twenty-seven state agencies may use the bond proceeds. We determine that § 301 fails to satisfy the purpose-of-borrowing requirement in Okla. Const., art. 10, § 16. We hold that the proposed bonds are not properly authorized in 73 O.S.2001, § 301.

## I. OCIA's Application for Approval of the Proposed Bonds

¶ 4 In its application for approval of the proposed bonds, OCIA asserted there is no valid distinction between this bond proposal and the bond proposal previously approved by this Court in *Fent v. Oklahoma Capitol Improvement Authority*, 1999 OK 64, 984 P.2d 200. In *Fent*, we approved the first half of the bonds authorized in 73 O.S.Supp.1998, § 301, a $162,700,000 bond proposal, against an attack that the bonds would create a debt requiring voter approval pursuant to Okla. Const., art. 10, § 25.[4]

¶ 5 Anticipating protests to its application, OCIA argued that the proposed bonds do not violate either the separation of powers requirement in Okla. Const., art. 4, § 1, the appropriation requirements in art. 5, § 55, nor the purpose of borrowing requirement in art. 10, § 16. OCIA contended that by designating twenty-seven state agencies to participate in the bond program and the dollar amount for each agency "for the purpose of 'capital projects which are important to the furtherance of state functions' " the statute passes constitutional muster for a self-liquidating revenue bond authorization statute.

## II. The Protests to the Proposed Bonds

¶ 6 Cassidy challenged the constitutionality of the 2000 amendments to § 301. He contended that the statutory provisions, allocating the borrowed funds to various state agencies, including $51 million to the Department of Central Services to be expended as directed by the Governor, without specifying the purpose, result in a delegation of legislative power which offends the state constitutional separation of powers doctrine and also violates the appropriations and borrowing provisions in Okla. Const., art. 4, § 1, art. 5, § 55, and art. 10, § 16.

¶ 7 In response to Cassidy, OCIA contended that the authorizing statute requires that the bond proceeds be used for capital projects of the specified agencies and confers discretion on the various agencies in choosing the capital projects. OCIA argued that the Legislature sufficiently set out general standards and policies for the use of the bond proceeds to guide the state agencies in carrying out the delegated power, citing Okla. Const., art. 4, § 1 and *Bailey v. State Board of Public Affairs*, 1944 OK 301, 194 Okla. 495, 153 P.2d 235.

¶ 8 Cassidy and Fent filed documents showing that Governor Keating and members of the Legislature agreed that the bond

---

**2.** This proceeding is authorized in 73 O.S.2001, § 160.

**3.** Article 10, § 16 of the Oklahoma Constitution provides: "All laws authorizing the borrowing of money by and on behalf of the State, county, or other political subdivision of the State, shall specify the purpose for which the money is to be used, and the money so borrowed shall be used for no other purpose."

**4.** OCIA asserted that, as in *Fent*, the proposed bonds are self-liquidating; they will not be backed by the full faith and credit of the state; they will not create a legal obligation beyond the current appropriation; they create only appropriation-risk or moral obligations which are not legally enforceable except to the extent each legislature actually appropriates funds for their retirement.

proceeds will be allocated as follows: House members will decide how to spend $55 million of the bond proceeds, Senate members will decide how to spend $55 million of the bond proceeds, and the Governor will decide how to spend $51 million of the bond proceeds. The documents listed some 520 possible projects for the bond proceeds. Cassidy asserted that this agreement is not an official legislative act and does not satisfy the purpose-of-borrowing requirement of Okla. Const., art. 10, § 16 nor the separation of powers doctrine of nondelegation.[5]

¶ 9 OCIA also acknowledged the existence of one or more lists prepared by individual legislative members directing a range of uses of the bond proceeds by various state agencies from purchasing equipment for rural firefighters to completing the Capitol dome. OCIA took the position that these "wish lists" are not a result of any official action of the Legislature and are not binding on the state agencies. OCIA explained that it will, with the assistance of the Office of the Attorney General, ultimately oversee the expenditure of the bond proceeds to assure that each project fulfills a lawful public purpose and does not involve the unconstitutional or unlawful gift or loan of proceeds to any local or private entity.

### III. The State Attorney General's Position

¶ 10 The OCIA, a state entity,[6] is represented in this proceeding by the Attorney General of the State of Oklahoma. Additionally, the Attorney General is *ex officio* Bond Commissioner of the State of Oklahoma, Okla. Const., art. 10, § 29, and tentatively approved the proposed bonds. However, because the protestants attack the constitutional validity of the statute authorizing issuance of the proposed bonds, this Court directed the Attorney General as Chief Law Enforcer to indicate whether his legal position with respect to the constitutional issues is reflected in the briefs filed by the Assistant Attorney General as attorney of record for the OCIA.[7]

¶ 11 The Attorney General took the position that the authorizing statute is not only presumed constitutional but is constitutional under this Court's pronouncement in *Fent v. Oklahoma Capitol Improvement Authority,* 1999 OK 64, 984 P.2d 200, "which approved bonds issued under Section 301 of Title 73, which in part provided funding for unspecified projects in designating $45,000,000 for 'Capitol projects at institutions of higher education which are part of the Oklahoma State System of Higher Education.' "

¶ 12 Cassidy replied to the Attorney General's position contending that a lump sum allocation of borrowed money to the Oklahoma State Regents for Higher Education for capital improvements sufficiently specifies the purpose for the borrowing. He referred to Okla. Const., art. 13–A, § 3, which

---

5. Protestants raised numerous other challenges. These include: 1) Cassidy's challenge to the agreement between the Legislators and the Governor on various other constitutional grounds, including Okla. Const., art. 10, § 14, which requires that taxes shall be levied and collected for public purposes, art. 10, § 15, which prohibits the use of the credit of the state for the benefit of individuals and cities, and art. 10, § 19, which requires that every measure levying a tax must specify the purpose of the tax; 2) Cassidy's challenge to the bond-approval process, asserting that OCIA approved only the five million dollar bond issue for the Capitol Dome project and that the Legislative Bond Oversight Commission coerced OCIA to seek approval of the $155,000,000 bond issue for "520 projects that were to be constructed on County, City, or Non Profit Corporation land"; 3) Fent's challenge to the constitutionality of the bond-approval process, attacking the Legislative Bond Oversight Commission and the Council of Bond Oversight

as violative of the separation of powers doctrine and the dual office holding prohibition; 4) Fent's challenge to the bond obligation, arguing that payment of the bonds from future general appropriations violates Okla. Const., art. 10, §§ 23 and 25; and, 5) Kessler's objection to the proposed bonds under the Okla. Const., art. 10, § 25, which requires that the bond proposal specify the work to be funded and the tax to repay it and that it be approved by the electorate.

6. The OCIA is created in 73 O.S.2001, §§ 151 *et seq.*

7. 12 O.S.2001, § 1652 and *Ethics Commission v. Cullison,* 1993 OK 37, ¶ 10, 850 P.2d 1069, 1074 (When the courts are asked to declare a statute unconstitutional, the Attorney General of the State of Oklahoma shall be served and is entitled to appear as the Chief Law Enforcer on behalf of the Legislature and the Governor.).

requires the Legislature to appropriate funds to the Board of Regents in consolidated form without reference to a particular institution and requires the Board of Regents to allocate the appropriated funds to each institution.

## IV. The Purpose–of–Borrowing Requirement in Okla. Const., art. 10, § 16

¶ 13 The Oklahoma Constitution, art. 10, § 16 requires the Legislature to specify the purpose for which borrowed money is to be used in a statute authorizing the State to borrow money. It also prohibits the use of the money so borrowed for any other purpose.

■ ¶ 14 This constitutional purpose-of-borrowing requirement is a limitation on the Legislature. *Protest of Reid,* 1932 OK 711, ¶ 7, 160 Okla. 3, 15 P.2d 995, 997–98. Its objective is to require legislative bodies to reveal the true purpose for which the borrowed money is to be used. *Borin v. City of Erick,* 1942 OK 144, ¶ 13, 190 Okla. 519, 125 P.2d 768, 770.

¶ 15 Application of the constitutional purpose-of-borrowing requirement to a state statute is a matter of first impression. However, this Court has considered the application of art. 10, § 16 to proposed municipal bonds and uses of municipal bond proceeds. Our decisions have, for the most part, strictly applied the constitutional purpose-of-borrowing requirement to limit the use of the proceeds.

¶ 16 In *Protest of Reid, supra.,* we concluded that the purpose-of-borrowing requirement limits not only the immediate use of money borrowed, but also limits any subsequent use of the proceeds from the sale of property purchased with money borrowed by a municipality. Similarly, in *Borin v. City of Erick, supra.,* we invalidated proposed municipal bonds, finding that the ordinance did

not specify the real purpose for borrowing money in that it failed to reveal the power plant would be constructed partially with federal grant money.[8] More recently, *Quinn v. City of Tulsa,* 1989 OK 112, ¶ 20, 777 P.2d 1331, 1336, reiterated the *Borin* rule that art. 10, § 16 prevents a municipality from using bond proceeds for a project that is substantially different from the planned project.

■ ¶ 17 *Protest of Reid* and *Borin v. City of Erick* utilized the word "purpose" in its ordinary meaning as "the thing to be accomplished." *See also, Barnes v. Barnes,* 1955 OK 34, ¶ 5, 280 P.2d 996, 998 (defining "purpose" as "the thing to be accomplished"). This interpretation of "purpose" as used in art. 10, § 16 is consistent with the firmly established presumption that words in the constitution have been employed in their natural and ordinary meaning by the framers and the people who adopted it. Thomas M. Cooley, LL.D., A Treatise on the Constitutional Limitations, vol. 1, p. 130 (8th ed.1927).

■ ¶ 18 While the analogy between the legislative authority of the sovereign state and the legislative authority of its municipalities is limited in its usefulness,[9] the underlying goal of art. 10, § 16 is the same for state or municipal borrowing—to require our elected officials to specify the purpose for borrowing money. Accordingly, the provisions of Okla. Const., art. 10, § 16 require that the statutory provisions authorizing the borrowing of money, the 2000 amendments to § 301, must specify the legislative object or thing to be accomplished with the borrowed money, i.e., the legislative purpose for the borrowing of the money.

## V. The 2000 amendments to 73 O.S.Supp.1999, § 301

■ ¶ 19 Cassidy argues that § 301 does not reveal the purposes for which the borrowed money may be expended contrary to

8. *City of Sallisaw v. Nesbitt,* 1963 OK 59, 380 P.2d 954, approved proposed bonds where the authorizing municipal ordinance was challenged for failure to specify that the bond proceeds would be supplemented with federal grant money and in the supplemental opinion on petition for rehearing, distinguished *Borin v. City of Erick* on the facts, at ¶ 4, 956–57.

9. A municipality can do only those things which are expressly authorized by the state constitution and statutes. On the other hand, the sovereign's inherent legislative power is without restriction except those limitations expressly provided in the constitution. *Graham v. Childers,* 1925 OK 888, ¶ 11, 114 Okla. 38, 241 P. 178, 180.

the purpose-of-borrowing requirement. On the other hand, OCIA argues that the legislative purpose of the borrowing authorized in § 301 is capital projects of listed agencies.

¶ 20 The arguments require us to examine the pertinent provisions of the 2000 amendments to § 301.[10] In summary, these provisions:

1) increase the authorized amount from $320 million to $325 million bonds;

2) allocate proceeds of the second half of the $325 million bonds to twenty-seven state agencies and direct the Governor to determine the use of approximately one-third of the bond proceeds;

3) declare legislative intent "to appropriate to the agencies administering the projects sufficient monies to make rental payments for the purpose of retiring the obligations" for the fiscal year ending June 30, 2002, and thereafter; and,

4) make legislative findings that the use of bond proceeds by municipalities and counties will effectuate essential state governmental functions relating to the services of fire protection, roads and bridges, historic preservation, recreational facilities, air transportation, housing and care of elderly, juvenile delinquency prevention, agriculture, horticulture, health care, tourism, economic development, and public safety.

 ¶ 21 Central to the controversy sought to be resolved is whether the statute, § 301, sufficiently specifies the purpose for which the proceeds of the proposed bonds are to be used. Upon careful consideration of the text of the 2000 amendments to § 301,[11] we conclude it does not.

¶ 22 Subsection (A)(16) of § 301 states "The following capital projects to be funded by the obligations authorized herein". However, a listing of projects does not follow. The subsection does not identify or otherwise describe a single "capital project" to be funded with the borrowed money. Rather, it sets forth a listing of the amounts of the borrowed money and identifies twenty-seven state agencies to which the various amounts are to be allocated. It does not, however, provide any description whatsoever of the projects to be accomplished by the twenty-seven state agencies with the borrowed money. This subsection does not reveal the purpose or the object of the borrowing.

¶ 23 While subsection (L) of § 301 identifies some twelve areas of services where the use of the borrowed money would effectuate the performance of essential state governmental functions, it is silent as to any description of any "capital project" that might be funded with the borrowed money. The listing of the twelve service areas, without more, simply does not disclose the projects to be accomplished with the borrowed money.

¶ 24 Subsection (M) of § 301 vests the identified state agencies with the authority as may be necessary to fully fund the projects for which the proceeds from the obligations authorized by this section are available. Although § 301(M) does not describe or otherwise identify a single project that the Legislature intended to be funded, OCIA argues that it sufficiently complies with the purpose-of-borrowing requirement. OCIA points out that § 301(M) requires the bond proceeds to be used for capital projects of the various state agencies and confers discretion in the agencies to select the capital project. While the Legislature undoubtedly may delegate to the agencies the task of implementing a declared policy under certain conditions,[12] the

---

10. The text of the 2000 amendments is set out in full in the appendix to this opinion.

11. When the validity of a state statute is drawn into question, the court approaches the subject with the greatest caution. The Legislature is presumed to have carefully observed the requirements of the constitution in enacting the statute. We indulge every presumption in favor of the validity of a statute and the presumption of validity is overcome only where a constitutional violation is clear. Any doubt as to the validity of a statute will be resolved in favor of the constitu-

tionality of the legislation. If the statute is susceptible to a meaning that will remove the objections to its validity, such interpretation must be adopted. *Way v. Grand Lake Ass'n, Inc.*, 1981 OK 70, ¶ 39, 635 P.2d 1010, 1016.

12. Concerning the constitutional doctrine of non-delegation, *Democratic Party of Oklahoma v. Estep*, 1982 OK 106, ¶ 16, 652 P.2d 271, 277, footnote 23, explained that "(w)hen the legislature sets the parameters of its policy and then delegates to some agency the task of implementing

power to delegate is limited by the purpose-of-borrowing provision in art. 10, § 16. OCIA's delegation argument reveals in itself that the specific projects to be accomplished with the borrowed money have not yet been determined.

¶ 25 The term "capital project" as used in § 301 is not a sufficiently descriptive designation of the things to be accomplished with the borrowed money to satisfy the purpose-of-borrowing requirement in Okla. Const., art.10, § 16. Oklahoma law provides no definition of the term. The word "capital" has different meanings when used in different connections.[13] When used as an adjective in a financial sense, "capital" means having to do with wealth or financial resources or general assets, including investment and surplus.[14] Imputing an unrestricted financial sense to the word "capital" as used in § 301, the agencies could expend the borrowed money for any "project" from the purchasing of dispensable supplies to the constructing of a building.

¶ 26 Realizing that the term "capital project" is imprecise in its meaning, the dissent looks to other Oklahoma law to define the term. The dissent, citing *Oklahoma Public Employees Association v. Oklahoma Department of Central Services*, 2002 OK 71, 126, 55 P.3d 1072, 1083, argues that "capital project" means the building or construction of a "capital improvement" because this Court discussed the meaning of such terms as "capital expenditure" and "capital outlay" and equated them to "capital improvement" in *City of Sand Springs v. Department of Public Welfare*, 1980 OK 36, 608 P.2d 1139.

¶ 27 The *Public Employees* case addressed the Department of Human Services' authority to privatize one of its institutions for the mentally retarded and the *Sand Springs* case addressed that department's authority to construct an institution for juvenile delinquents. Neither case made any attempt to define the term "capital project." By way of obiter dicta, the *Sand Springs* case did equate "capital expenditure" with "capital outlay," but did not equate either term with "capital improvement." The dissent, in its strained effort to give meaning to the term "capital project," overlooks the fact that none of the terms referred to in either case is used in the 2000 amendments to § 301.[15]

¶ 28 Relying heavily on *Edwards v. Childers*, 1924 OK 652, 102 Okla. 158, 228 P. 472, the dissent also complains that our reading of the purpose-of-borrowing requirement is overly restrictive and differs from the purpose requirement for legislative appropriations. We disagree. *Edwards* concerned the application of Okla. Const., art. 5, § 55, which requires an appropriation to **"distinctly specify** the sum appropriated and **the**

that policy under articulated safeguards, there is no violation of the doctrine."

**13.** 12A C.J.S. Capital, p. 913. On the other hand, the word "project" when used in reference to public or government works has a generally recognized meaning of a planned undertaking or definitely formulated proposal. 73 C.J.S. Project, p. 149.

**14.** 12A C.J.S. Capital p. 913, *see also* 68 O.S. 2001, § 1203.

**15.** The dissent also urges that we **link** "capital project" with "capital expenditure" as that term is used in the public finance statutes. The public finance statutes do utilize terms such as "capital project," "capital outlay," "capital expenditure," "capital facilities," and "capital improvement." *See,* State Capital Improvement Act, 62 O.S. 2001, §§ 900 *et seq.* creating the Long–Range Capital Planning Commission and 73 O.S.2001, § 310 recreating the State Facility Capital Needs Committee. *See also,* 62 O.S.2001, § 41.9 requiring agencies to identify those items that are for "capital purposes" in keeping with the "**definition of capital projects** promulgated by the Long–Range Capital Planning Commission" and to make requests for "capital appropriations" for "capital projects" that have been submitted to the Long–Range Capital Planning Commission. However, those statutes do not provide a certain meaning or definition to the term "capital projects" but leave the definition to the Long–Range Capital Planning Commission. That Commission has defined "capital items" and "capital facilities" but it has not defined "capital projects." Oklahoma Administrative Code, 428:10–1–3. In the Oklahoma Program Performance Budgeting and Accountability Act, 62 O.S.2001, §§ 45.1 *et seq,* the Legislature defined "capital improvement" to mean any building or infrastructure project that will be 1) owned by the state, 2) built with direct appropriations or state-issued bond proceeds, 3) cost at least $25,000 and 4) have a life of at least five years, but § 301 does not refer to "capital improvements."

**object** to which it is to be applied".[16] *Edwards* unmistakably teaches that the Legislature must provide a "descriptive designation" for each appropriated sum in order to satisfy art. 5, § 55. Our opinion today requires no more of the Legislature when it authorizes the borrowing of money than *Edwards* requires of the Legislature when it appropriates money.[17] Here, as in *Edwards*, the Legislature must provide descriptions of the projects for which the borrowed funds may be expended.

¶ 29 The Legislature has consistently provided descriptive designations of the projects to be funded in previous borrowing enactments, thereby recognizing the constitutional requirement to specify the purposes for which borrowed money will be expended.[18] For instance, the Legislature recently authorized borrowing "to construct improvements and facilities upon property under the control of the Department of Corrections suitable for use as a district probation and parole office".[19] Heretofore, the Legislature has never just simply identified an agency to receive appropriated or borrowed moneys without providing a descriptive designation of the project to be funded.

■■■ ¶ 30 The dissent correctly urges that the-purpose-of-borrowing provision must be harmonized with other constitutional provisions.[20] The power of the Legislature to authorize the issuance of state bonds is indeed subject to other restrictions in our state constitution. In addition to the purpose-of-borrowing requirement, the constitution also requires that no debts shall be contracted on behalf of the state unless submitted to a vote

16. In *Edwards v. Childers, supra.*, the court addressed whether statutes creating a special fund in the State Treasury, the State Highway Construction and Maintenance Fund, and dedicating gasoline excise tax revenues to the Fund constitute a valid appropriation. In resolving the issue, *Edwards* had to decide whether the statute "distinctly specified" the sum appropriated and the object to which it was to be used as required by art. 5, § 55.

As to the object or purpose of every appropriation, *Edwards* said that the general object for which moneys are to be expended must be designated. The earmarking statute considered in *Edwards* provided that the funds were to be expended on the construction of a primary system of highways and repair and maintenance of state highways. *Edwards* determined that this **descriptive designation of the object or purpose** for which the funds could be used satisfied the purpose requirement in art. 5, § 55. *Edwards*, 228 P. at p. 476.

17. The dissent takes the position that we are requiring detailed statements of costs, item by item, of each project. That is simply incorrect. We do not read Okla. Const., art. 10, § 16 to require the Legislature to provide a detailed itemization of every minute cost in order to satisfy the purpose-of-borrowing requirement. Article 10, § 16 does, however, require more than the name of a state agency authorized to spend the money. As in *Edwards*, the intended use must be described.

18. In its enactments before the 2000 amendments to § 301, the Legislature provided **descriptive designations**, in general rather than in minute detail, of the purposes to which borrowed money would be expended. In some sixteen measures authorizing the borrowing of a total of more than $265 million dollars, without a vote of the people, codified in Title 73, the Legislature described the purposes of the borrowings in general terms such as "to erect, operate and maintain a building or buildings for the use of the State Department of Public Safety, the place of erection to be upon the state-owned land at Northeast 36th Street and Eastern Avenue in Oklahoma City" in 1965 Okla. Sess. Laws, ch. 528, § 1, 73 O.S.2001, § 153–A; "to plan, acquire land for and erect, operate and maintain buildings for the use of the following state agencies" in 1968 Okla. Sess. Laws, ch. 330, § 1, 73 O.S.2001, § 168; "to acquire for and to erect, operate and maintain a building or buildings for the use of the Department of Human Services for the operation of a rehabilitation facility ... in Okmulgee County" in 1985 Okla. Sess. Laws, ch. 312, § 49, 73 O.S.2001, § 168.2; and, "for the funding, construction and maintenance of a building or buildings for use by the Board of Trustees of the Oklahoma School of Science and Mathematics" in 1991 Okla. Sess. Laws, ch. 270, § 37, 73 O.S.2001, § 168.4. Other such statutes authorizing the borrowing of money that contain descriptions of the purpose in similar language include: 1994 Okla. Sess. Laws, ch. 277, § 16, 73 O.S.2001, § 177; 1996 Okla. Sess. Laws, ch. 294, § 1, 73 O.S.2001, § 168.5; 1997 Okla. Sess. Laws, ch. 329, § 7, 73 O.S.2001, § 168.6; 1999 Okla. Sess. Laws, ch. 277, § 1, 73 O.S.2001, § 168.7; 2000 Okla. Sess. Laws, ch. 136, § 16, 73 O.S.2001, § 184.

19. 2001 Okla. Sess. Laws, ch. 102, § 1, 73 O.S. 2001, § 185.

20. Generally, constitutional provisions are construed as a consistent whole. *Cowart v. Piper*, 1983 OK 66, ¶ 4, 665 P.2d 315, 317.

of the people. Okla. Const., art. 10, § 25.[21] Like art. 10, § 16, art. 10, § 25 also requires that the work or object to be accomplished by the indebtedness be distinctly specified.

¶ 31 This Court has determined that the art. 10, § 25 requirement of an antecedent election does not apply where the bond or similar obligation does not constitute a debt of the state payable out of state funds or property, such as a self-liquidating project.[22] Because the specific projects to be funded by the proposed bonds have not yet been determined and will be decided at a future date,[23] it is impossible from a reading of § 301 to determine whether the proposed bonds in question will fund self-liquidating projects not requiring a vote of the people.

¶ 32 If the election requirement in art. 10, § 25 is to have any meaning, then the specificity requirement in that section demands that a descriptive designation of the project be specified in the authorizing law. If we are

to harmonize §§ 16 and 25 of art. 10, then the purpose-of-borrowing language in § 16 must require more than just the identity of the agency to receive the borrowed money.[24]

## VI. Allocation of Bond Proceeds to Higher Education

 ¶ 33 We recognize, as Cassidy pointed out, that appropriations for the institutions in the Oklahoma State System of Higher Education must be made in consolidated form without reference to any particular institution to be allocated by the Oklahoma State Regents for Higher Education according to the needs and functions of each institution. Okla. Const., art. 13–A, § 3.[25] Even if the allocation of some $30 million bond proceeds to the Oklahoma State Regents in § 301(A)(16)(m) satisfies the purpose-in-borrowing requirement in light of Article 13–A of the state constitution, that allocation cannot be saved.

21. Okla. Const., art. 10, § 25 provides that no debts shall be hereafter contracted by or on behalf of this State, unless such debt shall be authorized by law for some work or object, to be **distinctly specified therein** and further provides that such law shall have no effect unless it receives a majority vote at a general election.

22. This Court has approved bonds that provide funds—absent a general election—for acquisition or construction of self-liquidating projects. *Application of Board of Regents of University of Oklahoma,* 1945 OK 224, 195 Okla. 641, 161 P.2d 447, and *Application of Board of Regents for Oklahoma Agricultural and Mechanical Colleges,* 1946 OK 110, 196 Okla. 622, 167 P.2d 883 (bonds to be repaid from dormitory rents and fees paid by students); and, *Application of Oklahoma Turnpike Authority,* 1950 OK 208, 203 Okla. 335, 221 P.2d 795 (bonds to be repaid from tolls and fees paid by highway users). This kind of obligation does not create a debt because the bonds are repaid solely from revenue generated from the project itself.

23. The dissent envisions that each state agency will decide how to expend its allocation of borrowed money, except the Governor will make the decision for the $51 million allocated to the Department of Central Services. The Bond Advisor, however, advised us that his office and the office of the Attorney General will make the decisions. Both the dissent and the Bond Advisor seem to agree that the projects have not yet been determined, although it is not clear who would ultimately make those decisions.

24. The Oklahoma Constitution does not place the expenditure of public funds absolutely in the Oklahoma Legislature. The Oklahoma citizenry reserved to itself legislative power over all rightful subjects in art. 5, §§ 1 and 2. The obvious goal of the purpose-of-borrowing requirement in art. 10, § 16 is to protect the Oklahoma citizenry from the Legislature's abuse of the state's credit and the consequent oppression of burdensome taxation. The Oklahoma Legislature must specify the purpose of the borrowing, i.e., describe the designated project or object to be accomplished with the borrowed money, otherwise the exercise by the Oklahoma citizenry of its reserved legislative power is stifled.

Application of the language in art. 10, § 16 that "laws authorizing the borrowing of money ... shall **specify the purpose** for which the money is to be used" so as to require a general description of the purpose is consistent with our application of the similar purpose requirements placed upon the raising, borrowing and spending of public money. *See, Edwards v. Childers, supra.,* applying purpose requirement in Okla. Const., art. 5, § 55 that an "appropriation by law ... shall **distinctly specify** the sum appropriated and **the object** to which it is to be applied" and *City of Oklahoma City v. Oklahoma Tax Commission,* 1990 OK 27, 789 P.2d 1287 applying purpose requirement in art. 10, § 19 that an "act ... levying a tax shall **specify distinctly the purpose** for which said tax is levied".

25. This constitutional provision refers to appropriations by the legislature, it does not address the allocation of borrowed money.

■ ¶ 34 The Legislature did not expressly provide for the severability of the 2000 amendments to § 301.[26] In the absence of a severability clause, the offending portion of a statute may be severed from the non-offending portion, if it appears that 1) the Legislature would have enacted the statute without the offending portion and 2) the non-offending portion is capable of standing alone. *Application of Oklahoma Department of Transportation*, 2002 OK 74, ¶ 27, 64 P.3d 546, 553.

¶ 35 The Oklahoma State Regents aside, our decision today determines that the 2000 amendments to § 301 do not satisfy the constitutional requirements for borrowing with respect to twenty-six of the identified twenty-seven state agencies. After severing the allocations to twenty-six of the identified twenty-seven state agencies, only saving that to the Oklahoma State Regents, not enough remains in the statute to carry out the legislative intent. Stated in another way, the unconstitutional portion of the 2000 amendments to § 301 are such a significant portion of the whole as to make it impossible to give effect to the legislative authorization for the borrowing by saving only the allocation to the Oklahoma State Regents. Accordingly, the allocation of bond proceeds to the Oklahoma State Regents in subparagraph (m) cannot stand alone in § 301(A)(16).

26. 2000 Okla. Sess. Laws, ch.376, consists of two sections, § 1 amends 73 O.S.Supp.1999, § 301, and § 2 provides an effective date of September 1, 2000.

## VII. Conclusion

¶ 36 The purpose-of-borrowing requirement in the Oklahoma Constitution, art. 10, § 16 requires that a statute authorizing the borrowing of money must include a descriptive designation of the projects to be accomplished with the borrowed money. We determine that the 2000 amendments to § 301 authorize the borrowing of money without specifying the purposes for which the bond proceeds may be used. We conclude that the 2000 amendments to § 301 do not satisfy the purpose-of-borrowing requirement of Okla. Const., art. 10, § 16.[27] We hold that the proposed bonds are not properly authorized in 73 O.S.2001, § 301.

**APPLICATION FOR APPROVAL OF NOT TO EXCEED $155 MILLION OKLAHOMA CAPITOL IMPROVEMENT AUTHORITY STATE FACILITIES REVENUE BONDS, SERIES 2002C AND $20 MILLION, SERIES 2002D (TAXABLE) DENIED.**

WATT, C.J., and HODGES, LAVENDER, HARGRAVE, KAUGER, and WINCHESTER, JJ., concur.

OPALA, V.C.J., concurs in result and writes separately.

SUMMERS, J., dissents and writes separately.

27. Because we determine that 73 O.S.2001, § 301 does not satisfy the purpose-of-borrowing requirement in Okla. Const., art. 10, § 16, we do not address the other constitutional challenges asserted by the protestants.

## APPENDIX

73 O.S.Supp.2000, § 301, now codified at 73 O.S.2001, § 301, provides in part:

A. The Oklahoma Capitol Improvement Authority is authorized to acquire real property, together with improvements located thereon, and personal property, to construct buildings and other improvements to real property and to provide funding for repairs, refurbishments and improvements to real and personal property and for funding for the following capital projects in the following amounts:

16. The following capital projects to be funded by the obligations authorized herein in the amounts to be allocated and expended by the following entities and in the following amounts:

| | | |
|---|---|---|
| a. | the Oklahoma Aeronautics Commission | $ 2,990,000.00 |
| b. | the State Department of Agriculture | $ 5,044,194.00 |
| c. | the Oklahoma State Bureau of Investigation | $ 300,000.00 |
| d. | the Oklahoma Capitol Complex and Centennial Commission | $ 5,470,101.00 |
| e. | the Department of Central Services | $ 975,000.00 |
| f. | the Oklahoma Department of Commerce | $ 1,250,000,00 |
| g. | the Oklahoma Conservation Commission | $ 100,000.00 |
| h. | the Oklahoma Department of Corrections | $ 260,101.00 |
| i. | the State Department of Education | $ 700,000.00 |
| j. | the Oklahoma Educational Television Authority | $ 250,000.00 |
| k. | the Grand River Dam Authority | $ 220,000.00 |
| l. | the State Department of Health | $ 735,000.00 |
| m. | the Oklahoma State Regents for Higher Education | $ 30,617,909.00 |
| n. | the Oklahoma Historical Society | $ 10,456,303.00 |
| o. | the Oklahoma House of Representatives | $ 46,434.00 |
| p. | the Department of Human Services | $ 2,010,101.00 |
| q. | the J.D. McCarty Center for Children with Developmental Disabilities | $ 485,101.00 |
| r. | the Office of Juvenile Affairs | $ 1,227,601.00 |
| s. | the Oklahoma Department of Mental Health and Substance Abuse Services | $ 2,075,000.00 |
| t. | the Oklahoma Military Department | $ 5,700,101.00 |
| u. | the Department of Public Safety | $ 1,194,000.00 |
| v. | the Oklahoma Department of Tourism and Recreation | $ 10,565,005.00 |
| w. | the Oklahoma Department of Transportation | $ 5,241,412.00 |
| x. | the Oklahoma Department of Veterans Affairs | $ 1,450,000.00 |
| y. | the Oklahoma Department of Career and Technology Education | $ 13,845,303.00 |
| z. | the Oklahoma Water Resources Board | $ 1,850,000.00 |
| aa. | the Oklahoma Department of Wildlife Conservation | $ 608,000.00 |
| bb. | the Department of Central Services | $ 51,833,333.00 |
| | GRAND TOTAL | $ 157,499,999.00 |

The funds allocated in subparagraph bb of this paragraph shall be spent for capital projects which are important to the furtherance of state functions, as directed by the Governor.

C. For the purpose of paying the costs for acquisition and construction of the real property and improvements and personal property and making the repairs, refurbishments, and improvements to real and personal property, and providing funding for the projects authorized in subsection A of this section, and for the purpose authorized in subsection D of this section, the Authority is hereby authorized to borrow monies on the credit of the income and revenues to be derived from the leasing of such real and personal property and improvements and, in anticipation of the collection of such income and revenues, to issue negotiable obligations in a total amount not to exceed Three Hundred Twenty-five Million Dollars ($325,000,000.00) whether issued in one or more series. The Department of Central Services is authorized and directed to expend funds from the Capitol Improvement Revolving Fund in amounts sufficient to make required payments pursuant to such obligations during the fiscal year ending June 30, 1999. For subsequent fiscal years, it is the intent of the Legislature to appropriate to the indicated state agencies sufficient monies to make rental payments for the purposes of retiring the obligations created pursuant to this section. Provided, the Authority shall not issue any obligations

pursuant to this section for the purpose of providing funding for the projects authorized in paragraph 16 of subsection A of this section prior to January 1, 2001. For the fiscal year ending June 30, 2002, and thereafter, it is the intent of the Legislature to appropriate to the agencies administering the projects sufficient monies to make rental payments for the purpose of retiring the obligations created pursuant to this section.

J. Insofar as they are not in conflict with the provisions of this section, the provisions of Section 151 et seq. of this title shall apply to this section.

K. To the extent that the provisions of paragraph 3 of subsection K of Section 85.4 of Title 74 of the Oklahoma Statutes would otherwise be applicable, such provisions shall be inapplicable to assets acquired, for ownership or for use, through the proceeds from the obligations authorized by paragraph 16 of subsection A of this section.

L. The Legislature finds that several functions of state government are properly performed through the delivery of state services by use of political subdivisions. In order to facilitate the delivery of essential state services and in furtherance of state governmental functions by the construction, acquisition or improvement of assets which may be located within the corporate limits of a municipality of the State of Oklahoma or which may be located in unincorporated areas of the state and subject to the jurisdiction of a board of county commissioners, but which nonetheless serve an important function of state government, the State of Oklahoma finds that the use of the proceeds from the issuance of obligations pursuant to this section effectuates the performance of essential state governmental functions, including, but not limited to:
1. Fire protection services;
2. Roads, bridges and highways located either partially within or completely within the corporate limits of a municipality or in an unincorporated area of the state;
3. Historic preservation;
4. Recreational facilities;
5. Air transportation infrastructure;
6. Facilities for the housing and care of the elderly;
7. Juvenile delinquency prevention and treatment facilities;
8. Agricultural and horticultural event facilities;
9. Health care facilities, including, but not limited to facilities the primary purpose of which is the treatment or prevention of communicable diseases or illness;
10. Promotion of tourism;
11. Promotion of economic development and business site selection; and
12. Public safety.

M. Notwithstanding any other provision of law to the contrary, each and every agency, board, commission, department or other entity of state government as identified in paragraph 16 of subsection A of this section shall have the authority to acquire or to transfer such property, whether real or personal, tangible or intangible, as may be required to fully fund the projects and to acquire or improve the assets for which the proceeds from the obligations authorized by this section are available.

OPALA, V.C.J., concurring in result.

¶ 1 Although I am persuaded that today's pronouncement represents a correct resolution of an issue in this controversy, I *cannot give it my unqualified assent.* **The bonded indebtedness to be approved today is tainted by a pervasive and clearly incurable flaw.** It cannot facially qualify as a self-liquidating loan transaction. Aside from its deficient descriptive designation, the obligation's repayment source is not shown to come from a project-generated revenue stream but rather appears to draw from the uncertainty (or risk of legislative appropriation). The State *may not borrow for any purpose without a vote of her people.* Art. 10 § 25, Okl. Const. Attaching to the loan a "moral obligation" label will not erase the reality of placing the State in the status of a borrower. *It is the act of receiving borrowed money sans the voters' assent which offends the Constitution's prohibition that lies at the base of this controversy.*

¶ 2 *Without fully joining the court's pronouncement, I concur solely in today's refusal to approve the bonds* sought to be issued. For a full explanation of my analyses see *Application of Oklahoma Capitol Imp. Auth.,* 1998 OK 25, 958 P.2d 759, 779 (Opala, J., dissenting).

SUMMERS, J. Dissenting.

¶ 1 The Court concludes that the bond issue does not satisfy Article 10 § 16 of the Oklahoma Constitution because the "purpose" of the funds is not set forth with specificity. I respectfully dissent from that conclusion. The Oklahoma Constitution contains two provisions that require a law to specify the purpose for which public money is spent: Okla. Const. Art 10 § 16 (borrowed funds), and Art. 5 § 55 (appropriated funds). In arriving at a meaning for the former the Court declines to use our precedent on the latter. The result is that one standard will apply to laws authorizing the borrowing of money and a different one to appropriated funds. Further, I submit that the standard used by the Court today for Art. 10 § 16 is overly restrictive. Finally, I would reject the other legal challenges and approve the bonds.

## I. The Purpose of the Bonds

¶ 2 Section 16 of Article 10 states as follows:

§ 16. Borrowing money—Specification of purpose—Use

All laws authorizing the borrowing of money by and on behalf of the State, county, or other political subdivision of the State, shall specify the purpose for which the money is to be used, and the money so borrowed shall be used for no other purpose.

Section 16 provides that "laws ... shall specify the purpose for which the money is to be used...."

¶ 3 Provisions of the Oklahoma Constitution are interpreted in conformity with their ordinary significance in the English language. *In re Initiative Petition No. 363, State Question No. 672,* 1996 OK 122, 927

P.2d 558, 570. The words of those provisions are given their plain, natural and ordinary meaning. *A.E. v. State,* 1987 OK 76, 743 P.2d 1041, 1046. This *sensus literalis* approach to the meaning of a particular word is followed unless the context furnishes some ground to control, qualify, or enlarge the meaning. *State ex rel. Ogden v. Hunt,* 1955 OK 125, 286 P.2d 1088, 1091. The context of the language in § 16 does not require a technical meaning for the phrase "laws ... shall specify the purpose for which the money is to be used...." The ordinary meaning of these words should be applied.

¶ 4 Section 55 of Article 5 states as follows:

§ 55. Appropriations—Necessity and requisites

No money shall ever be paid out of the treasury of this State, nor any of its funds, nor any of the funds under its management, except in pursuance of an appropriation by law, nor unless such payments be made within two and one-half years after the passage of such appropriation act, and **every such law** making a new appropriation, or continuing or reviving an appropriation, **shall distinctly specify** the sum appropriated and **the object to which it is to be applied,** and it shall not be sufficient for such law to refer to any other law to fix such sum.

(Emphasis added).

The term "object" for which funds are appropriated by law is also the "purpose" stated in that appropriation for which the money is to be expended. *Sibel v. State Bd. of Public Affairs,* 1952 OK 196, 244 P.2d 307, 310, *quoting, Meyer, State Auditor, v. Clift,* 1912 OK 201, 123 P. 1042, 1043. This definition is consistent with the definition of "purpose" in the Oklahoma Bond Oversight and Reform Act: " 'Purpose' means the issuer's principal intended use of the funds derived from the issuance of bonds or other obligations." 62 O.S.2001 § 695.3(6).

¶ 5 The "object" requirement for appropriations in Art. 5 § 55 is similar to the "purpose" requirement for borrowed funds in Art. 10 § 16.[1] In *Edwards v. Childers,* 1924

---

1. Judicially using the same standard for defining "purpose" and "object" serves an important

OK 652, 228 P. 472, we looked at Art. 5 § 55 and approved a lump sum appropriation, via the creation of a special fund, to the State Highway Commission for building new highways and the repair and maintenance of highways already constructed. *Id.* 228 P. at 473. Although specific capital projects were not listed we said that

> by the terms of the act, appropriated and directed to be expended for a special purpose and in an express manner, amounts to an appropriation of the entire fund so created, and where the amount accruing to and paid into said fund is capable of being definitely ascertained, it is sufficiently definite and certain to comply with the provisions of article 5, § 55, of the Constitution.....
>
> No set of lawmakers can sit in the Capitol of the state and intelligently specify for a year or two in advance the moneys to be expended in the different items of cost of the various projects or road business or just how that detailed work shall be done. The general object for these moneys are to be expended is designated in the statutes under consideration as "the construction of a primary system of highways" and "the repairing and maintenance of state highways." No law could intelligently and successfully make detailed classifications and distinctions in a very extensive further subdivision of these objects specified in the statute. The term "object" may be satisfied by a descriptive designation without a complete description of its various possible subdivisions. *Id.* 228 P. at 476.

¶ 6 Our conclusion in *Edwards* was based upon three concepts: (1) That construction, maintenance, and repair of a *system* of highways was incapable of being itemized for exact amounts per project, (2) That funding for some of the capital projects would have a source other than the appropriation (such as bonds); and (3) That the Commission, as officials of the State, had its discretion controlled by other enactments involving the duties of the Commission. *Id.* 228 P. at 476.

public policy when, for example, a capital project is funded from both appropriations and a separate bond issue, and each are thus able to constitutionally use the same language for stating the same object or purpose. *See, e.g., Edwards v.*

¶ 7 As to the first element mentioned in *Edwards,* this Court is aware that appropriating or borrowing a specific amount of funds for constructing a specific road or highway sometimes is possible. *See, e.g., Application of Oklahoma Turnpike Authority,* 1966 OK 139, 416 P.2d 860, (turnpike bonds). But the issue in *Edwards* was whether the Legislature could approach the problem of capital improvements to the highways of the state as a *system* instead of the Legislature trying to determine the exact location of individual roads needed for the system. The Court concluded that (1) the specific amount appropriated, (2) a legislative purpose of creating and repairing highways (capital projects), and (3) statutes setting forth the nature of the state entity's duties worked together to define the object of the appropriation sufficient to satisfy Art. 5 § 55. To hold otherwise would unnecessarily hinder the Legislature's ability to address and fund problems on a system-wide basis that occur within a particular state agency's sphere of responsibility.

¶ 8 Clearly, as the Court's opinion states, money borrowed for one purpose or object may not be expended upon a different one. But, as the Court's opinion indicates, the issue is how specific the Constitution requires the Legislature to be when stating the purpose or object of public borrowing.

¶ 9 The Court states that lump-sum amounts designated to specific state agencies for "capital projects" does not specify the purpose of the expenditure sufficient to satisfy Art. 10 § 16. The Court has discussed the meaning of phrases such as "capital expenditure" and "capital outlay", and equated them with the act of constructing or building a capital improvement. *Oklahoma Public Employees Association v. Oklahoma Dept. of Central Services,* 2002 OK 71, ¶ 26, 55 P.3d 1072, 1083, *explaining, City of Sand Springs v. Department of Public Welfare,* 1980 OK 36, 608 P.2d 1139.

*Childers,* 1924 OK 652, 228 P. 472, (recognizing that construction of highways may include both appropriated money and funds from other sources, including bonds).

¶ 10 As the Court's opinion indicates, these capital projects are assigned to particular state agencies. We have recently explained that public officers possess only such authority as is granted by law, and that authority must be exercised in the manner provided by law. *Oklahoma Public Employees Association v. Oklahoma Dept. of Central Services,* 2002 OK 71, at ¶ 27, 55 P.3d at 1084. State agencies and their public officers are limited, as matter of law, upon what they spend public funds. This limit springs from several sources, and one of these is the nature of the authority vested in the agency or officer doing the spending.

¶ 11 For example, § 301(16)(p) provides $2,010,101.00 for the Department of Human Services. In *Oklahoma Public Employees Association* the Court examined at some length the contractual authority of the Department of Human Services. *Id.* at ¶¶ 22–39, 55 P.3d at 1081–1088. Section 301 authorizes the issuance of bonds but does not expand upon the authority of state agencies, such as DHS, that receive the funds.[2] In other words, the capital projects funded by the bond issue must fund capital expenditures that are within the statutory and constitutional authority of the particular agency.

¶ 12 Linking capital expenditures to specific state agencies is also consistent with the "Oklahoma Program Performance Budgeting and Accountability Act." 62 O.S.2001 § 45.1 *et seq.* This Act requires a state agency to "make a strategic plan for its operations" that includes: "A summary of the capital improvement needs of the agency which were provided to the Long–Range Capital Planning Commission as required by Section 901 of Title 62 of the Oklahoma Statutes." 62 O.S.2001 § 45.3(A) & (B)(7).[3] The amounts

from the bond issue in the case before us are not mere numbers pulled from of the air, but reflect the Legislature's considered judgment based upon particularized capital needs of the state agencies involved.

¶ 13 The stated purpose of § 301 is consistent with how the Legislature has approved past bond issues of the Oklahoma Capitol Improvement Authority. The Authority was created in 1959 as "an instrumentality of the State" and given the authority for the "construction, equipping, operation and maintenance of the state building or buildings...." 73 O.S.1961 § 152(a). These buildings were identified as those "for the use of state and/or federal agencies and departments", with the Authority selecting the place of erection within the Capitol Improvement and Zoning District. 73 O.S.1961 § 153(a). The Authority could issue ten million dollars in bonds for the construction of the buildings.73 O.S.1961 § 153(b). The Authority had other powers relating to the erecting and maintaining these buildings. 73 O.S.1961 § 161.

¶ 14 The 1959 Act gave a statutorily stated purpose of providing office space to state agencies. 73 O.S.1961 § 151. However, the Authority possessed the discretion to determine the number of buildings and their size. 73 O.S.1961 §§ 153, 161. The Authority possessed the discretion, jointly with the State Board of Public Affairs, to determine those state agencies which would use the new buildings. 73 O.S.1961 § 163. In other words, in addition to the dollar amount of the bonds, the Act specified only that the buildings (capital improvements) must be used by state or federal agencies, and that they be built within the Capitol Improvement and Zoning District. The Act did not specify how

2. Section 301 does define certain state functions. 73 O.S.2001 § 301(L). A particular state agency created by law possesses that authority vested in the agency by law. *Oklahoma Public Employees Association v. Oklahoma Dept. of Central Services, supra.* An activity legislatively defined as a "state function" does not, by itself, give any particular state entity the authority to perform that activity. The specific state agency must be vested with the authority for the specific function, either express or implied, in order for that particular agency to perform the function. *Id.* The definition of a "state function" is addressed

subsequently herein in the context of a different constitutional challenge.

3. Capital improvements are defined by 62 O.S. 2001 § 45.3(F):

"F. In this section, "capital improvement" means any building or infrastructure project that will be owned by the state and built with direct appropriations or with the proceeds of state-issued bonds or paid from revenue sources other than general revenue at a cost of at least Twenty-five Thousand Dollars ($25,000.00) and has a useful life of at least five (5) years."

many or what kind of buildings, or which state agencies would use the buildings.

¶ 15 In 1971 the Authority was given a general authorization to erect, equip, operate, and maintain buildings for the use of state and/or federal agencies at any place or location within the State of Oklahoma. 73 O.S. 1971 § 153(a). The Legislature has also at various times given the Authority an authorization to construct and maintain buildings for specific agencies. For example, in 1971 the Authority was authorized to erect, operate, and maintain buildings for the Department of Public Safety on Northeast 36th Street in Oklahoma City. *Id.* The Authority has also been given an authorization for capital expenditures other than buildings. For example, in 1997 the Legislature added that: "It shall also be the purpose of this act to provide an improved and expanded highway infrastructure for the health, safety, and welfare of the traveling public in this state and for the continued economic development of this state." 73 O.S.Supp.1997 § 151.

¶ 16 The legislative history of the Capitol Improvement Authority thus shows a purpose in its function. It was created and has been used for erecting, operating, and maintaining, certain projects for the State, i.e., capital projects that fulfill a public purpose. The legislation before the Court today continues that purpose.

¶ 17 The stated purpose of § 301 is similar to the legislatively expressed purposes in bond issues involving other Authorities. The Act before the Court today specifies dollar amounts for "capital projects" for specific state agencies. If other statutes are examined some have more specificity than § 301,[4] some have the same, and some have both. For example, the "purposes" section of the 1961 Building Bonds Act states in part that:

... [the] Building Bonds Commission ... shall incur indebtedness to the extent of the sum of Thirty-five Million Five Hundred Thousand Dollars ($35,500,000.00) as principal, for the purpose of constructing new buildings and other capital improvements, and for equipping, remodeling, modernizing and repairing any and all existing buildings and capital improvements, at the constituent institutions of the Oklahoma State System of Higher Education provided that Five Million Dollars ($5,000,-000.00) thereof shall be used to construct and equip a school and hospital for mentally retarded children in Northeastern Oklahoma...."

62 O.S.1961 § 57.32.

A state entity, State System of Higher Education, was provided with approximately thirty million dollars for "new buildings and other capital improvements, and for equipping, remodeling, modernizing and repairing any and all existing buildings and capital improvements, at the constituent institutions...." In sum, the purposes statement did not tell the state entity what individual projects would be funded, or how much money would be spent on the individual capital projects the state entity chose to build. In similar fashion, today's § 301 identifies the state entity and the amount going to the state entity, but does not specify particular projects in that statute.

¶ 18 In sum, § 301 states that its purpose is to fund capital projects for particular state entities in specified amounts. Past bond issues have stated a purpose of funding capital projects for particular state entities. Those state agencies possess only that authority granted to them by statute and constitution. I must therefore conclude that Article 10 § 16 has been satisfied.

---

4. An example of a higher degree of specificity in the **form** of a bond issue is found in 70 O.S.2001 § 23–109. That statute requires the Oklahoma Educational Television Authority (OETA) to provide "by resolution" for the issuance of revenue bonds to pay the costs for its projects, "but each project shall be covered by a separate resolution and separate bond issue or issues." *Id.*

The **substance** of the authority of the OETA to issue the bonds is similar to the Capitol Improve-

ment Authority. The Capitol Improvement Authority possesses a general authorization to erect, equip, operate, and maintain buildings for the purpose of fulfilling capital needs of state agencies (73 O.S.2001 § 153), and the OETA also possesses a general authorization to plan, construct, repair, maintain and operate educational television facilities for fulfilling the capital needs of OETA (70 O.S.2001 § 23–101).

## II. Other Arguments

¶ 19 Section 301 is also challenged as violating the separation of powers principle. Respondents also allege that: (1) Legislators sitting on the Legislative Bond Oversight Commission violate the dual-office holding principle; (2) the Legislative Bond Oversight Commission is unconstitutional; (3) the Legislative Bond Oversight Commission exercises an improper delegation of power; (4) a bond approval proceeding involving the Legislative Bond Oversight Commission is unconstitutional; (5) the acts of the Legislative Bond Oversight Commission are void; and (6) that the Court's ruling on these bonds must be effective retrospectively.

¶ 20 We have recently said that "the approval of the LBOC [Legislative Bond Oversight Commission] in the note-approval process, constitutes a usurpation by the Legislature of the powers of the executive branch and violates Oklahoma's constitutional separation of powers provision." *In re*

5. 62 O.S.2001 § 695.11A:

> Council of Bond Oversight—Validation of actions and obligations—Members—Quorum—Voting—Vacancy
> A. In the event either the Executive or Legislative Bond Oversight Commission is found unconstitutional by a final, unappealed order of a court of competent jurisdiction, all of the powers, duties and responsibilities of the Commissions shall devolve upon the Council of Bond Oversight, and previous joint or individual actions, approvals and disapprovals of the Executive and Legislative Bond Oversight Commissions are hereby confirmed, ratified, validated and deemed incontestable. In the event the Executive or the Legislative Bond Oversight Commission or the Council of Bond Oversight is found unconstitutional by a final, unappealed order of a court of competent jurisdiction, such determination shall not nullify joint or individual actions, approvals and disapprovals of the Executive and Legislative Bond Oversight Commissions or the Council of Bond Oversight and any obligations entered into by the Oklahoma Development Finance Authority pursuant to provisions of the Oklahoma Development Finance Authority Act and the Credit Enhancement Reserve Fund Act with approval by the Bond Oversight Commissions or the Council of Bond Oversight and such obligations are hereby confirmed, ratified, validated and deemed incontestable.
> B. The Council shall consist of five (5) non-legislative members. One member shall be appointed by the Speaker of the House of Representatives, one member shall be appointed by the President Pro Tempore of the Senate, two mem-

*Oklahoma Dept. of Transp. for Approval of Not to Exceed $100 Million Oklahoma Dept. of Transp. Grant Anticipation Notes, Series 2002,* 2002 OK 74, ¶ 21, 64 P.3d 546, 552.

¶ 21 The issue then becomes whether the bond issue may proceed although the acts of the Legislative Bond Oversight Commission were unconstitutional. The Attorney General says yes, it may, because the bond issue was also submitted to the Council of Bond Oversight. In response, the constitutionality of the Council of Bond Oversight is challenged. In reply, the Capitol Improvement Authority argues that even if the Council of Bond Oversight is unconstitutional, the Capitol Improvement Authority may proceed with issuing the bonds.

¶ 22 The Council of Bond Oversight was created to act and fulfill the duties of the Legislative Bond Oversight Commission in the event the latter was determined to unconstitutional.[5] *In re Oklahoma Dept. of*

> bers shall be appointed by the Governor with the advice and consent of the Senate and one member shall be the Director of State Finance. Three members of the Council shall constitute a quorum. The affirmative vote of three members present and voting shall be necessary for any action taken by the Council. Appointed members shall serve a term of two (2) years and may be removed for cause by the appointing authority. Members may be appointed for additional terms.
> C. A vacancy on the Council shall be filled in a like manner as the original appointment, but only for the remainder of the term. The Council shall elect one of its members chairman and may elect such other officers as it deems necessary. No vacancy in the membership of the Council shall impair the right of the Council to exercise all rights and duties of the Council.
> D. If the powers, duties and responsibilities of the Commissions devolve upon the Council pursuant to this section, the person serving as the Oklahoma State Bond Advisor on the date of such devolution shall continue to serve in that position until the Governor appoints a new Oklahoma State Bond Advisor from a list of candidates provided by the Council and said appointee has been confirmed by the Senate. Thereafter, and in the case of a vacancy, the Oklahoma State Bond Advisor shall be appointed, subject to the advice and consent of the Senate, by the Governor from a list of candidates provided by the Council and shall serve a term of office coterminous with that of the appointing Governor. The Oklahoma State Bond Advisor may be removed by the Council for cause, after a public hearing.

*Transp. for Approval of Not to Exceed $100 Million Oklahoma Dept. of Transp. Grant Anticipation Notes, Series 2002,* 2002 OK 74, ¶ 28, 64 P.3d 546, 553–554. Therein this Court expressed no opinion on whether the make-up of the Council of Bond Oversight might present the same constitutional difficulties relating to separation of powers as did the Legislative Bond Oversight Commission. *Id.* at n. 19, 64 P.3d at 555. However, we did note that unlike the Legislative Bond Oversight Commission, the Council of Bond Oversight is not made up of a majority of legislators, nor could the members appointed by either the President Pro Tempore of the Senate or the Speaker of the House of Representatives effectively block bond approval. *Id.*

¶ 23 Constitutionality of the Council of Bond Oversight is challenged based upon the fact that two appointees to the Council are not appointed by the Governor. The power of appointment is not an exclusive function of the executive, legislative or judicial departments. *Keating v. Edmondson,* 2001 OK 110, ¶ 16, 37 P.3d 882, 889. We also said that the Governor's appointment powers do not arise from any inherent power vested in the office. *Id.* I also note that those challenging the legislative appointments do not point to any "appointments clause" of our State Constitution. *See, e.g., Seymour v. Elections Enforcement Commission,* 255 Conn. 78, 762 A.2d 880, 895 (2000), *cert. denied,* 533 U.S. 951, 121 S.Ct. 2594, 150 L.Ed.2d 752 (2001), (appointments to state commission by legislature did not violate state constitutional principle of separation of powers because the constitution did not contain an appointments clause similar to that in U.S. Constitution, art. II, § 2, cl. 2, and the exercise of the power by the legislature did not significantly interfere with the essential functions of the executive branch).[6] The challenge to the appointments to the Council by members of the Legislature is without merit.

¶ 24 Section 301 allocates approximately fifty-two million dollars to the Department of Central Services for capital projects. Petitioners challenge this allocation because the discretion of the Department of Central Services to make the capital projects is dependent upon the approval of the Governor. The Governor does not possess unfettered discretion to decide upon what the purpose of the funds. The funds are allocated to a specific state agency with its duties established by law. The Governor must work within the framework of capital expenses for capital projects within the scope of the Department's duties. For example, one of the duties of the Department is:

B. The Department of Central Services shall have charge of the construction, repair, maintenance, insurance, and operation of all buildings owned, used, or occupied by or on behalf of the state including buildings owned by the Oklahoma Capitol Improvement Authority where such services are carried out by contract with the Authority. Whenever feasible, the Department of Central Services may utilize the Construction Division of the Department of Corrections for the construction and repair of buildings for the Department of Corrections.

C. The Director of the Department of Central Services shall have authority to purchase all material and perform all other duties necessary in the construction, repair, and maintenance of all buildings under its management or control, shall make all necessary contracts by or on behalf of the state for any buildings or rooms rented for the use of the state or any of the officers thereof, and shall have charge of the arrangement and allotment of space in such buildings among the different state officers.

74 O.S.2001 § 63(B) & (C).

Allocating a large portion of the bond funds to the state agency actually responsible for constructing, repairing, and maintaining

---

**6.** The Court has explained that the Governor's power of appointment was limited when the Oklahoma Constitution was created. *Keating v. Edmondson,* 2001 OK 110, n. 41, 37 P.3d 882, 890. The Constitution states that: "The Governor shall commission all officers **not otherwise**

**commissioned by law."** Art. 6 § 13, emphasis added. This language was taken from a similar provision in the Constitution of Missouri. R.L. Williams, *The Constitution of Oklahoma and Enabling Act,* Art. 6 § 13 (2d ed.1941).

state buildings, including those owned by the Capitol Improvement Authority appears to be consistent with the purpose of spending the bond funds on capital projects.

¶ 25 If, as I have previously argued, a specific lump-sum amount may be constitutionally allocated to a particular state agency for the construction of capital projects, then only one issue is involved in this challenge: Whether the Legislature may place the Department of Central Services under the administrative control of the Governor for the purpose of making the capital expenditures.

¶ 26 The Department of Central Services is part of the Executive Department. 74 O.S.2001 § 61.2.[7] The Governor appoints the Director of the Department. 74 O.S.2001 § 61.1. The Director of the Department of Central Services, as part of the Executive Department, performs those duties designated in the Oklahoma Constitution "or prescribed by law." Okla. Const. Art. 6 § 1.

¶ 27 Many executive powers of the Governor find their source in legislative enactments. For example, the Governor has the power to remove certain officials. 74 O.S. 2001 § 2.[8] Power exercised thereunder is statutorily granted and does not spring from the Governor's constitutional powers. *Wentz v. Thomas*, 1932 OK 636, 15 P.2d 65, (Governor's power to remove a statutory executive officer did not arise from the State Constitution, but was statutory and did not include the removal of highway commissioners).

¶ 28 This Court has explained that the Legislature has the power to define the executive powers of those executive officials statutorily created. *Wentz v. Thomas*, 1932 OK

636, 15 P.2d 65. The Legislature also possesses the power to vest Executive Authority in those officials, such the Governor, listed in Article 6 of the Oklahoma Constitution. *See, e.g., Norris v. Cross,* 1909 OK 316, 105 P. 1000, (a writ of mandamus will issue to the Secretary of State to compel performance with a mandatory statutory duty). Thus, the Executive Authority exercised by the Department of Central Services as it relates to the Governor may be statutorily defined by the Legislature.

¶ 29 There are many examples of the Governor's statutory powers.[9] One type relevant to this controversy occurs when the Legislature creates an executive authority in a particular official of the Executive Department, and makes the exercise of that authority under the direction of the Governor. For example,

The Director of State Finance shall have the power, and it shall be his duty **under the direction of the Governor:** (1) to prepare the budget document and assist in the drafting of legislation to make it effective, (2) to make field surveys and studies of governmental agencies, looking toward economy and greater efficiency, (3) to make allotments to control expenditures, (4) to authorize transfers of appropriation authorized by law, (5) to study accounting and other reports rendered by the Central Accounting and Reporting Division, (6) to enter into agreements with the United States Secretary of the Treasury for the purpose of implementing the Cash Management Improvement Act of 1990 (Public Law 101–453), and (7) **to aid the Governor** in the economical management of state

---

7. 74 O.S.2001 § 61.2:

There is hereby created in the Executive Department, a Department of Central Services, under the administrative control of the Director of Central Services. Whenever the terms "Board of Affairs", "State Board of Public Affairs", "Board" when used in reference to the Board of Public Affairs or "Office of Public Affairs", appear in the Oklahoma Statutes they shall mean the Department of Central Services. Whenever the term "Director of Public Affairs" appears in the Oklahoma Statutes it shall mean the Director of Central Services.

8. 74 O.S.2001 § 2:

The Governor shall have the power to remove any officers appointed by him, in case of incompetency, neglect of duty, or malfeasance in office; and may then fill the same as provided in cases of vacancy.

9. An additional type of Executive statutory power occurs when the Legislature authorizes the Governor to delegate a Governor's statutory duty to another official in the Executive Department. *See, e.g.,* 2 O.S.2001 § 16–37 (Governor, as administrator of the South Central Interstate Forest Fire Protection Compact, "shall have authority to delegate the exercise of the powers and duties to the Director of Forestry, Division of Forestry, State Board of Agriculture").

affairs. In addition to his other duties the Director of State Finance shall, upon request, advise and consult with members of the Legislature and legislative committees concerning income and expenditures of state agencies.

62 O.S.2001 § 41.4, (emphasis added).

The authority exercised by the Director of State Finance is similar to that created by § 301. The exercise of statutory Executive Authority possessed by the Department of Central Services is limited by the statutory Executive Authority granted to the Governor. The Governor is aware of the State's capital needs. As part of the State Capital Improvement Planning Act: "The Governor shall prepare at the same time as the state budget document is prepared, a capital budget. The capital budget shall be prepared and submitted by the Governor or Governor-elect in accordance with the procedures for preparing the state budget document." 62 O.S.2001 § 901(D)(3). Including the Governor as part of the Department's exercise of authority does not violate the Oklahoma Constitution.

¶ 30 The next challenge is that the Oklahoma Capital Improvement Authority is without power to authorize municipalities and counties to spend funds generated by the sale of bonds. The allegedly offending portion states:

L. The Legislature finds that several functions of state government are properly performed through the delivery of state services by use of political subdivisions. In order to facilitate the delivery of essential state services and in furtherance of state governmental functions by the construction, acquisition or improvement of assets which may be located within the corporate limits of a municipality of the State of Oklahoma or which may be located in unincorporated areas of the state and subject to the jurisdiction of a board of county commissioners, but which nonetheless serve an important function of state government, the State of Oklahoma finds that the use of the proceeds from the issuance of obligations pursuant to this section effectuates the performance of essential state governmental functions, including, but not limited to:

1. Fire protection services;

2. Roads, bridges and highways located either partially within or completely within the corporate limits of a municipality or in an unincorporated area of the state;

3. Historic preservation;

4. Recreational facilities;

5. Air transportation infrastructure;

6. Facilities for the housing and care of the elderly;

7. Juvenile delinquency prevention and treatment facilities;

8. Agricultural and horticultural event facilities;

9. Health care facilities, including, but not limited to facilities the primary purpose of which is the treatment or prevention of communicable diseases or illness;

10. Promotion of tourism;

11. Promotion of economic development and business site selection; and

12. Public safety.

73 O.S.2001 § 301(L).

This language does not authorize any specific amount of funds to go to any municipality or county. The provisions of § 301 authorizing specific funds identify specific state entities to receive those funds for capital projects.

¶ 31 The State may not pledge or lend its credit to a municipal corporation. Okla. Const. Art. 10 § 15(A);[10] *Reherman v. Oklahoma Water Resources Bd.*, 1984 OK 12, 679 P.2d 1296, 1302 The state agencies receiving the funds may not violate Article 10 § 15, a provision of the our Constitution, upon a mere grant of legislative authority. Section 15 is a substantive limitation upon the Legislature's power. By that I mean that an Act of the Legislature stating that a

10. Okla. Const. Art. 10 § 15 states in part:

A. Except as provided by this section, the credit of the State shall not be given, pledged, or loaned to any individual, company, corporation, or association, municipality, or political subdivision of the State, nor shall the State become an owner or stockholder in, nor make donation by gift, subscription to stock, by tax, or otherwise, to any company, association, or corporation.

particular expenditure is a state function (and thus not for a municipal purpose) is not determinative of the issue of whether § 15 is violated by the enactment. It is the unique duty of the judiciary to preserve our constitution and, when a legislative enactment conflicts with its provisions, to declare the statute unconstitutional. *State ex rel. York v. Turpen,* 1984 OK 26, 681 P.2d 763, 767; *State ex rel. Tharel v. Board of Commissioners of Creek County,* 1940 OK 468, 107 P.2d 542, 547, 550. *See also Reed v. State Election Bd.,* 1962 OK 37, 369 P.2d 156, 158, (syllabus by the court).

¶ 32 Our inquiry is based upon whether the attack challenges the statute upon its face, or as applied by a particular official. *St. Paul Fire & Marine Ins. Co. v. Getty Oil Co.,* 1989 OK 139, 782 P.2d 915, 917, (discussing attacks upon a statute as applied); *Tulsa County Deputy Sheriff's Fraternal Order of Police, Lodge Number 188 v. Board of County Commissioners of Tulsa County,* 2000 OK 2, ¶¶ 9–10, 995 P.2d 1124, 1136, (Opala, J., dissenting), (discussion of facial and "as applied" constitutional attacks upon a statute). The present controversy is not framed as a facial attack upon the statute. For example, there is no argument that the Legislature has impermissibly defined building of *all* roads geographically located in a municipality as a state function. This Court has stated that: "We are of the opinion that the sections referred to by plaintiffs confer authority on the State Highway Commission to make expenditures to improve streets within a city where they are a part of the Highway System, and also to participate with cities in the improvement of such streets." *Ambrister v. City of Norman,* 1959 OK 172, 344 P.2d 665, 668. Underlying this approach is the concept that a particular capital project had

characteristics of both local and state concern.

¶ 33 The attack in this proceeding is based upon the allegation that some officials may eventually use the bond proceeds for purely municipal expenditures. Deciding whether § 15 is violated by a particular expenditure requires an examination of that particular transaction. *See, e.g., Petition of University Hospitals Authority,* 1997 OK 162, ¶ 21, 953 P.2d 314, 321, where we cited *Children's Home & Welfare Association v. Childers,* 1946 OK 180, 171 P.2d 613, and explained that a contract between the state and a children's home for the care of orphaned children did not violate § 15, and that the payment of appropriated funds in return for these services was not a prohibited transfer of public funds to a private organization. The particular transactions by the state agencies spending the funds at some future date are not before the Court.[11]

¶ 34 The language in § 301(L) defines certain state governmental functions. This language does not *require* a particular a state agency to use bond proceeds in violation of § 15 for purely municipal functions. In deciding the constitutionality of statutes, a legislative act is presumed to be constitutional and will be upheld unless it is clearly, palpably and plainly inconsistent with the Constitution. *Reherman v. Oklahoma Water Resources Bd.,* 679 P.2d at 1300. Whenever possible, statutes should be construed so as to uphold their constitutionality. *Id.* There is no reason to assume that a public official will take an unconstitutional view, as opposed to a constitutional view, of § 301.[12]

¶ 35 Section 301 is also challenged as violating Article 10 § 20.[13] This section prohibits the Legislature from imposing taxes for the purpose of a county, city, town or other

---

**11.** Proposed expenditures by individual officials, which may, or may not, ultimately receive approval by the governing state board or commission present hypothetical controversies. This Court does not provide advisory opinions on hypothetical questions. *Dank v. Benson,* 2000 OK 40, 5 P.3d 1088, 1091; *Ethics Commission v. Keating,* 1998 OK 36, n. 8, 958 P.2d 1250, 1259.

**12.** This Court assumes that when a public official knows his or her duties then the official will act in good faith in the performance of those duties,

unless some reason to the contrary is shown. *State ex rel. Haning v. Department of Public Welfare,* 1952 OK 229, 245 P.2d 452, 455, (court stated rule in the context of mandamus).

**13.** Okla. Const. Art. 10 § 20:

The Legislature shall not impose taxes for the purpose of any county, city, town, or other municipal corporation, but may, by general laws, confer on the proper authorities thereof, respectively, the power to assess and collect such taxes.

municipal corporation. This challenge also assumes that the "debt retirement payments" as specified in § 301 will be derived from "taxes" imposed by the Legislature. Assuming for the purpose of argument that this is correct, the same response to this claim could be made as that to the claim that § 301 violates Art. 10 § 15: Section 301 does not *require* state officials to use bond funds for a municipal purpose.

¶ 36 Section 301 is challenged with the argument that "SB 973 does not clearly express in its title the subjects of the Act." Article 5 § 57 of the Oklahoma Constitution [14] and *John Deere Plow Co. v. Owens,* 1943 OK 284, 147 P.2d 149 are the authorities cited. In *Mistletoe Express Service v. United Parcel Service, Inc.,* 1983 OK 27, 674 P.2d 1, the Court quoted from *Jones v. State,* 1975 OK CR 222, 542 P.2d 1316, and said the following:

> In numerous cases the courts of this state have held that the purpose of this constitutional provision is to prevent the blending of repugnant objects in one act and the inclusion of provisions not indicated by the title in order that those interested may not be misled or misinformed as to the contents of the statute. (Citations omitted.) Additionally, it has been repeatedly held that this section is not to be construed in such a manner as to hamper or unreasonably restrict the Legislature in the performance of its duty. (Citations omitted.) It has repeatedly been held that this section is general and comprehensive in nature and where the body of the act is germane, relative and cognate to the title of the act, it is sufficient to meet the requirements of the constitution. (Citations omitted.) Also, if the clauses of the statute are referable and cognate to the subject expressed in the title, the title need not set out each clause of the act. (Citations omitted.) Neither need the title of a statute embrace an abstract of its contents when the title otherwise fairly indicates the general purpose of the statute. (Citations omitted.)

*Mistletoe,* 674 P.2d at 6.

¶ 37 S.B. No. 973 does have a title. See 2000 Okla. Sess. Laws, Ch. 376 (West) & 2000 Okla. Sess. Laws, 1st Extraordinary Session, Ch. 7 (West). The titles are germane to the provisions of the statute. The challenge to the Act's title is not specific as to the flaw perceived and need not be addressed further.

¶ 38 Finally, the major argument in this litigation is the petitioners' argument that the Court should reverse itself on two opinions: *Application of Oklahoma Capitol Improvement Authority,* 1998 OK 25, 958 P.2d 759, and *Fent v. Oklahoma Capitol Improvement Authority,* 1999 OK 64, 984 P.2d 200. This argument is broader than just these two opinions. This is so because the heart of petitioners' argument addresses the reasoning of the Court in *Application of Oklahoma Capitol Improvement Authority,* 1960 OK 207, 355 P.2d 1028.

¶ 39 In *Application of Oklahoma Capitol Improvement Authority,* 1960 OK 207, 355 P.2d 1028, this Court examined whether the bonds were a state debt. The bond funds were used to build office buildings, and the money to repay the bonds came "solely from the revenues from the office buildings." *Application of Oklahoma Capitol Improvement Authority,* 355 P.2d at 1030. The Authority, with Public Affairs, could require state agencies to use and lease the office buildings. The same statutes stated that the debt created was not that of the State. The Court did not examine the nature of the revenue source the state agencies would use in making the lease payments. In our case today, petitioners assert that the Court must determine if the state agencies will retire the indebtedness via funds from future general appropria-

---

14. Okla. Const. Art. 5 § 57:

Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title, except general appropriation bills, general revenue bills, and bills adopting a code, digest, or revision of statutes; and no law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only; but so much thereof as is revived, amended, extended, or conferred shall be re-enacted and published at length: Provided, That if any subject be embraced in any act contrary to the provisions of this section, such act shall be void only as to so much of the laws as may not be expressed in the title thereof.

tions or a state fund already in existence.[15] We declined to do this forty years ago, or in the intervening years when the Authority was used to construct other buildings for state agencies.

¶ 40 In *Application of Oklahoma Capitol Improvement Authority*, 1960 OK 207, 355 P.2d 1028, the payments made by the state agencies were used to retire the debt. Today under § 301 payments made by the state agencies are used to retire the debt. The Legislature and this Court has followed this type of analysis for more than forty years, and the Legislature has relied upon this interpretation in creating financing for the needs of state government.

¶ 41 This Court does not, as a rule, inquire into the construction of a constitutional provision or the constitutionality of a statute when this question was ruled on in previous decisions by a court of last resort, unless such previous decisions are manifestly erroneous, and there are cogent reasons for overruling them; and this is especially true where such decisions have been long relied on as authoritative. *In re Real Property of Integris Realty Corp.*, 2002 OK 85, ¶ 12, 58 P.3d 200, 204–205, *quoting, Oklahoma County v. Queen City Lodge No. 197, I.O.O.F.*, 1945 OK 55, 156 P.2d 340. Thus, I would deny the petitioners' request for this Court to overrule its opinions on this subject.

### III. Conclusion

¶ 42 The Court should use a definition for "purpose" in Art. 10 § 16 for borrowing that would also satisfy the purpose requirement in Art. 5 § 55 for appropriations. Capital projects may utilize both appropriated moneys and bond-funding, and the same requirement for the separate funding sources should be construed similarly. The history of funding for bonds in this State shows that bonds are approved when lump-sum amounts are provided to a particular state entity for capital expenditures.

¶ 43 The Court may approve of the bonds in this proceeding without hypothesizing

---

**15.** *See Application of Oklahoma Ed. Television Authority*, 1954 OK 219, 272 P.2d 1027, 1033, (court discussed the distinction between a self-liquidating debt [defined therein as a debt paid

whether state officials will attempt to read into § 301 a greater authority than they possess because of the limits imposed by Okla. Const. Art. 10 §§ 15 and 20. We are asked to approve of a class of funding capital expenditures in specific amounts for state entities-that which is present on the face of § 301, and not potential unauthorized transfers to municipalities. State officials could not read anything into our approval other than what is actually before us. In sum, I would approve the bonds, and once again decline the petitioners' invitation to revisit *Application of Oklahoma Capitol Improvement Authority*, 1960 OK 207, 355 P.2d 1028.

from revenue generated from the facility built using the bond funds], and a debt against an existing permanent fund of the state and its future revenues).